**ALLSTATE INSURANCE COMPANY,
a foreign corporation, Plaintiff-
Appellant,**

**v.**

**Keith HISELEY et al., Defendants-
Appellees.**

**No. 71–1721.**

United States Court of Appeals,
Tenth Circuit.

Sept. 8, 1972.

James E. Poe, Tulsa, Okl. (Richard D. Gibbon, of Covington, Gibbon & Poe, Tulsa, Okl., on the brief), for plaintiff-appellant. ·

Tom R. Mason, Muskogee, Okl. (Bonds, Matthews & Bonds, Joe R. Boatman, and Max D. Watkins, Muskogee, Okl., with him on the brief), for defendants-appellees.

Before PHILLIPS, SETH and Mc-WILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

Allstate Insurance Company brought a declaratory judgment action seeking a declaration that neither of two automobile insurance policies issued by it were applicable to or afforded coverage for any of the named defendants with regard to the consequences of a two-car collision between a Chrysler and a Ford. The named defendants in the declaratory judgment proceeding were the several occupants of both the Chrysler and the Ford.

Prior to the accident in question, Allstate had issued an automobile indemnity policy to Wanda Maher, the owner of the Chrysler. The other policy of insurance here involved had been issued by Allstate to one Tommie Hiseley, the father of Keith Hiseley, the latter being the driver of the Chrysler at the time when the Chrysler forced the Ford off the highway and into a ditch.

Trial was to the court and resulted in a declaratory judgment that both policies of insurance were in force and effect at the time of the aforesaid collision and that no exclusionary provision of either policy had application. In thus holding, the trial court rejected the contention advanced by Allstate that neither policy of insurance was in force and effect because at the time of the collision Keith Hiseley, the driver of the Chrysler, did not have permission to drive from the named insured owner, Wanda Maher; and, alternatively, that coverage under both policies was expressly excluded under a clause in each that the policy did not apply to "bodily injury or property damage caused intentionally by or at the direction of the insured." Allstate now appeals.

In our disposition of the matter we shall accept as correct the trial court's finding that Hiseley at the time of the collision was driving the Chrysler with the implied permission of Wanda Maher, the owner. In this regard our study of the record indicates that there is supporting evidence for such finding. However, in our view, the trial court's further finding that "the evidence does not establish an intent to injure through the driving of the [Chrysler] automobile" is clearly erroneous and accordingly the judgment must be reversed. To demonstrate the correctness of our own conclusion, the operative facts must be fully developed.

Wanda Maher, the owner of the Chrysler, gave her sixteen-year-old son, David, permission to drive the Chrysler from Warner, Oklahoma, to nearby Muskogee, the purpose of the trip being to enable David and a friend to see a drive-in movie. Instead, David and about five of his friends drove to Marvin's Bar, located somewhere on the road to Muskogee, where all consumed some beer. Parked outside Marvin's Bar was a Ford, which it later developed was driven by one Gary Alverson, one of the defendants in the declaratory judgment proceeding.

As David Maher and his group were exiting Marvin's Bar, one of their number, for no apparent reason other than his consumption of beer, proceeded to knock out a glass window of the unoccupied Ford. The Chrysler, with one Lester Leake, another defendant in the declaratory judgment action, at the wheel, was then driven eastward into Warner, stopping at the Gulf Cafe for coffee.

In the meantime, Gary Alverson, and his friend, Finsel, exited Marvin's Bar and noticed that the glass in their car had been broken. They then proceeded to drive eastward towards their home in Fort Smith, Arkansas. Alverson apparently also stopped at the Gulf Cafe in Warner to inquire about directions. In any event, he espied the parked Chrysler and, determining to his own satisfaction that it was an occupant of that car who had broken his window, he proceeded to throw a pop bottle through a window of the Chrysler. Alverson and his friend quickly departed the scene and continued their eastward trek towards Fort Smith.

When David Maher and his group found that a window in the Chrysler had been broken, they for some reason suspected at once that the deed had been perpetrated by an occupant of the Ford and they determined to give pursuit. At this point, Lester Leake was driving, Keith Hiseley was in the middle of the front seat, and David Maher was in the front seat on the right-hand side. Driving at speeds over 100 miles per hour, the Leake-driven Chrysler soon overtook the Ford driven by Gary Alverson. Then, over a distance of many miles, the Chrysler "bumped" or "rammed," depending on the point of view of the particular witness, the rear end of the Ford. Leake testified that on several occasions Hiseley would "put his foot onto my foot, which was on the gas pedal, and then he stepped down on it to make me speed up, and then he took the steering wheel and ran me into their car."

The Ford eventually either slowed down, or stopped, to the end that the Chrysler went on ahead and came to a complete stop, with the occupants getting out of the Chrysler. The Ford then started up suddenly and passed the stopped Chrysler. Keith Hiseley then took the keys from Leake, by force, and assumed control of the Chrysler. With Hiseley driving, Leake now seated in the middle, and David Maher seated on he right-hand side of the front seat, the chase was resumed. The Hiseley-driven Chrysler soon overtook the Ford and Hiseley then rammed the Ford in the rear end seven or eight times.

Just which particular incident forced the Ford off the road into the ditch is in some dispute, though in our view whichever version is accepted the end result, namely, the Ford winding up in the ditch, was the direct result of Hiseley's operation of the Chrysler. David Maher testified in effect that the "Ford was finally knocked off the highway by contact between the Chrysler and the Ford." A city marshal who had given chase gave a slightly different version. He testified that he saw the Chrysler get along side the Ford and it "came right into the side of the car." However, according to the city marshal, the driver of the Ford did not lose control at that moment, and the Chrysler again fell in behind the Ford and started "bumping" the Ford once again. It was in this setting, according to this witness, that the driver of the Ford lost control. He described it thus: " * * * [A]ll I seen was the Ford, looks like it throwed it

right straight up in the air * * *. I seen the Ford when it was airborne."

Gary Alverson, the driver of the Ford, testified that as he recalled it, he was forced off the road, stating that "they came up beside me and put their car against mine and pushed me off the road." He further testified that he applied his brakes, trying to slow down and avoid going off the road.

Some dispute arose as to whether the brakes were applied before or after the impact, or were applied both before and after. This we regard to be of minor significance. Both cars were proceeding at about 100 miles per hour and it is quite understandable that there were some differences of opinion as to the exact sequence of events. In this connection, a state highway patrolman testified as follows:

"* * * [T]he Ford * * * skidded approximately 60 feet before impact and then traveled 130 feet going into a broad slide off the roadway and went airborne for approximately 111 feet. It rolled one half time in mid-air and came down on its top, and then rolled another one and one half times, landing back on its wheels through a distance of 100 feet."

As indicated, the trial court adopted the defendants' theory of the case, namely, that Keith Hiseley in his driving of the Chrysler did not intend to cause bodily injury or property damage to anyone or anything. In this connection, it is asserted by counsel that the only intent of any occupant of the Chrysler was to stop the Ford, get its license number and report all to the police. The trial court's findings in this connection were a bit different, the trial court finding in effect that "the intent was not to injure with the automobile by causing an accident, but to harass and frighten Alverson and Finsel, and perhaps stop them along the road—to what end can only be guessed at."

Concerning the matter of the subjective, mental intent of the parties, it is of interest to note that Keith Hiseley did not testify upon trial of the case, though he was present during trial. So, as concerns Keith Hiseley, at least, his intent can only be determined from his deeds. This is true, even though David Maher and Lester Leake did testify as to their subjective, mental intent. In this regard, David Maher testified that they "chased" the Ford only in order to obtain a license number, "getting them to stop, who they were, and why they did that to our car," and that there was no discussion about "hurting the people in the other car, or causing them injury."

Lester Leake's testimony on this point differed a bit. He agreed that initially it was their intent to simply get the license number of the Ford and that they had no intent "to run them off the road or harm them in any manner." However, Leake went on to testify that after Keith Hiseley assumed control of the steering wheel, there was further discussion and this discussion was to the effect that the way to stop them was "to run them off the road." In this same vein, Leake also testified that "objections" were made to the manner in which Hiseley was driving. Specifically, according to Leake, Hiseley was told to "quit," because "he was going to get someone hurt, he was going to hurt the cars." In response to the question as to whether it was "apparent" that something would happen, Leake responded: "If they kept on someone was going to get hurt."

We recognize that under Fed.R.Civ.P. 52(a) in an action tried to the court without a jury, its findings of fact may not, on review, be set aside unless "clearly erroneous." In United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948), it was stated that a finding was "clearly erroneous" when, though there be evidence to support it, the reviewing court on the record before it "is left with the definite and firm conviction that a mistake has been committed." In Federal Security Insurance Company v. Smith, 259 F.2d 294 (10th Cir. 1958), we stated that "it is well established that appellate

courts are required to accept findings of fact if supported by substantial evidence and not clearly erroneous." And in that case "substantial evidence" was defined as "more than a mere scintilla, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Applying this test to the findings and conclusions of the trial court as such relate to the issue of an intent to injure on the part of Hiseley, we conclude that there is not substantial evidence to support its findings in this regard.

The particular findings of the trial court with which we take issue, which have been referred to briefly above, are, in their entirety, as follows:

"With respect to the 'intent to injure' provisions of the policies, there is in fact sufficient evidence from which such intent could be inferred. There is direct testimony, however, that the intent was not to injure with the automobile by causing an accident, but to harass and frighten Alverson and Finsel, and perhaps to stop them along the road—to what end can only be guessed at. Certainly, Alverson in the handling of his automobile made every effort to get away from them and was worried about what would happen if he did not. Further, if the intent to injure by causing the Ford automobile to be wrecked had existed, there were numerous opportunities during the long, high speed chase for this to have been done. From the evidence, it appears that the accident only happened after Alverson undertook to stop, probably having in mind to seek the protection of the Roland City Marshal who was following them immediately prior to the accident with his red light flashing and therefore undoubtedly easily seen by Alverson. At any rate, this court cannot say that it was more probably true than not that an intent to injure existed within the meaning of the policies.

"It is the conclusion of the court, therefore, * * * that the exclu-sionary provisions relied on by the plaintiff do not apply, and that the plaintiff is fully obligated under the terms and conditions of its policies of insurance."

Before considering the applicable law on the subject, we would first make brief comment regarding the findings of the trial court. Initially the trial court observed that there was sufficient evidence from which an intent to injure could be inferred. Then there is the statement that there is direct testimony that the intent was not to injure by causing an accident, but only to harass or frighten. As indicated, however, such testimony came from only Maher and Leake, not from Hiseley, and it is the latter's conduct that is under scrutiny. Furthermore, Leake's testimony in this regard would indicate that after Hiseley took control of the Chrysler it was decided "to run them off the road." The trial court noted that the chase took place over a 40 to 50 mile distance and that there were numerous opportunities early in the chase to run the Ford off the road if that had been the intent. This ignores the fact that Leake was driving during the first phase of the chase, and Hiseley himself took control only during the latter stages of the chase. And, as previously commented on, the fact that Alverson may have applied his brakes at or about the time he was forced into the ditch does not in anywise absolve Hiseley. Let us now examine the law on this particular matter.

In Pendergraft v. Commercial Standard Fire & Marine Co., 342 F.2d 427 (10th Cir. 1965), a case arising in Oklahoma, the insurer issued its insured a comprehensive liability insurance policy which contained an exclusion providing that the liability clause did not apply "to bodily injury or property damage caused intentionally by or at the direction of the insured." The insured intentionally struck another in the face, knocking the latter to the street where he struck his head on a paved portion of the street, fracturing his skull. The insured testi-

fied that while he intentionally struck his victim, he did not intend to inflict the specific injuries sustained. On appeal, we affirmed the trial court's finding that the policy in question afforded no coverage because of the clause excluding liability for intentional bodily injury, and that this was so even though the insured may not have intended the specific injuries sustained. In so holding, we added that "we would be most reluctant, had the [trial] court decided this case the other way, to put our stamp of approval upon a rule that would be based on subjective, rather than objective, intent."

Rankin v. Farmers Elevator Mutual Insurance Company, 393 F.2d 718 (10th Cir. 1968), a case arising in Kansas, presents a factual situation akin to the instant one. There, a motorist provoked by a motorcyclist drove alongside him at 50 miles per hour and deliberately turned his truck against the motorcycle and its rider. The motorist had a policy of family insurance which excluded any liability for "bodily injury or property damage caused intentionally by or at the direction of the insured." In affirming the action of the trial court in granting summary judgment for the insurance company on the grounds that under the exclusionary clause it had no duty to defend or indemnify the motorist, we made the following pertinent comment:

"It is not necessary in this case to make any subtle distinctions between an intentional act and an intentional injury resulting from an act. * * * This is not the kind of case where an actor causes a missile to be thrown without contemplating or having a design that it should strike the person thereby injured. Here the driver of a truck, while traveling at a speed of fifty miles an hour along side of a motorcycle going in the same direction at the same speed, deliberately and purposefully threw his truck against the motorcycle and its rider. Persons are presumed to intend the natural and probable consequences of their acts * * *."

We do not regard Lumbermen's Mutual Insurance Company, Mansfield, Ohio v. Blackburn, 477 P.2d 62 (Okl. 1970), as dictating a different result. In the first place, the throwing of a rock on a junior high school playground is conduct far different from the driving of a motor' vehicle at speeds up to 120 miles per hour and then the ramming, bumping and pushing of another vehicle off the road and into the ditch. In Rankin, such type of driving was distinguished from the mere throwing of a missle without intent that it injure anyone. Additionally, in Blackburn it was stipulated that the acts of the insured "were without any intent to injure the plaintiffs." In the instant case, there was no such stipulation and indeed the existence of an intent to injure was perhaps the main issue in the case. And the import of our holding is simply that the trial court's findings in this regard do not find support in the record.

In sum, then, on the record before it, the trial court could only find that Keith Hiseley did have an intent to commit bodily injury and property damage, and accordingly the trial court should have held that coverage was expressly excluded under the clauses in both of the policies here involved to the effect that there was no liability on the part of Allstate for "bodily injury or property damage caused intentionally by or at the direction of the insured."

Judgment reversed and cause remanded with the direction that the trial court enter judgment in favor of Allstate in conformity with the views herein expressed.