NATIONAL INVESTORS LIFE AND CASUALTY
INSURANCE COMPANY and AMERICAN
NATIONAL PROPERTY AND CASUALTY
COMPANY *v.* James ARROWOOD and
Sandra ARROWOOD

CA 80-164                                 606 S.W. 2d 97

Court of Appeals of Arkansas
Opinion delivered October 8, 1980

618

*Wright, Lindsey & Jennings*, for appellants.

*Ray Baxter* and *Hall, Tucker, Lovell, Alsobrook & Moudy*, for appellees.

STEELE HAYS, Judge. The interpretation of two homeowner's insurance policies is the basis of this appeal. The questions presented are: whether bodily injury to Sandra Arrowood caused by James Arrowood, her former husband, comes within the coverage of the two policies, and secondly, whether the home where the injury occurred is covered under one of the policies.

The insuring companies contend that Sandra Arrowood's injury was intentionally caused and, therefore, liability coverage is excluded under either policy. Additionally, the language of one of the policies is such that the insuring company contends that coverage of the home where the injury occurred is excluded under that policy.

These issues were asserted in a suit for declaratory judgment and resulted in a judgment by the trial court that the insurance companies had failed to meet the burden of proving that the exclusions were applicable to the case at bar. We believe the judgment of the trial court was clearly against the preponderance of the evidence.

On September 5, 1979, Sandra Arrowood was struck by a bullet fired from a .38 caliber pistol held by James Arrowood. The wound was to the thigh of her left leg, midway and posterior. The incident occurred at 2911 Pamela Drive, a home owned by James Arrowood but occupied by Sandra Arrowood, pursuant to divorce decree between the parties. The parties married in 1976, each having been married previously.

Unquestionably, James Arrowood is given to outbursts of violent temper. He had struck Sandra on numerous occasions and had administered a severe beating in March of 1979. As a consequence, the marriage had been disrupted by several divorce suits with ensuing reconciliations. The March incident was of such a degree that Sandra had cause to fear for her life and she brought criminal charges and a divorce action which this time she pursued to finality. James was placed on probation as a result of the criminal charges. The divorce decree awarded possession of the house at 2911 Pamela Drive to Sandra. James resided with his parents at 1016 Watson Place in Benton.

The parties appear to have maintained a relationship of some sort, and James would occasionally spend the night at 2911 Pamela Drive, most recently a week or so prior to the shooting incident. James wanted to get back together; Sandra was "leery" of such a prospect.

James did not like for Sandra to date other men; which she attributed to jealousy, and there seem to have been problems over one individual in particular.

A careful and thorough recitation of the circumstances surrounding the events of September 5 are in order. On the night of September 4, at around midnight, Sandra came home from a date and observed James' truck in her driveway, the motor running and the radio on. James was in the backyard with a partially consumed eight-pack of beer. She turned off the ignition of the truck, went inside and started preparing for bed. James followed her in to talk about getting back together and about Sandra seeing other men. She told him she was tired and was going to bed. James said he would finish his beer and leave. For no apparent reason, James appears to have called his father to come and get him. Albert Arrowood's testimony is that James called him shortly after midnight and asked him to come and get him, which he did. When he arrived at Sandra's home and knocked, James came to the door; Mr. Arrowood said, "I've come to get you." James answered, "Okay," and then proceeded to get in his own truck and each man drove to the Watson dwelling in

their separate vehicles. Mr. Arrowood offered no explanation for his behavior and James professed no recollection of it.

The next morning James returned while Sandra was dressing and renewed the conversation of the night before. By her account, he was not drunk, angry or upset, and spoke in a calm, quiet manner, in contrast to the previous occasions when he had hurt her. As the two were standing in the bedroom, Sandra turned to pick up her jeans, and while so doing she heard a pistol shot. Not immediately aware that she had been struck, she turned to see James holding a pistol, which she at first thought to be a toy. She described James as appearing startled and surprised and saying, in effect, that he was sorry, he had not meant to do it. Realizing that she had been struck, she sat on the bed, and asked James to bring a towel to stem the blood. Sandra called her sister to come and stay with her daughter and James called his parents. James and Sandra then proceeded to go to the hospital in James' truck. As they were about to leave, James' parents arrived and at Sandra's suggestion James handed the pistol to his father.

James' account of the incident is of little help: he did not remember going to Sandra's house on the morning of September 5, nor any part of the night before. He did not remember calling his father. In short, he had no recall of the events surrounding the shooting, including carrying the pistol into the house or what caused the pistol to fire. His explanation for his loss of memory is that he had taken "a bunch of Valium." Some circumstances were supplied by his testimony: he had owned the pistol three or four years and had kept it in the side pocket of the door of his truck; that the pistol had a double action and would not discharge without pulling the trigger or pulling the hammer back. He stated he had no reason to shoot or kill Sandra.

On September 10, a damage suit was brought by Sandra Arrowood against James Arrowood and criminal charges were filed as well, both of which are pending: James called upon appellant, National Investors Life and Casualty Insurance Company, to defend him under the homeowner's policy covering 2911 Pamela Drive. Under reservation of

rights, the companies undertook the defense and then brought the declaratory judgment suit previously mentioned.

The companies contend that liability coverage is not afforded by either policy under provisions entitled "EXCLUSIONS," which read:

This policy does not apply:
1. Under Coverage E — Personal Liability . . .
   f. To bodily injury or property damage which is either expected or intended from the standpoint of the insured.

Additionally, National Investors takes the further position that liability coverage is not afforded under the "EXCLUSIONS" part of its policy by reason of the following language:

This policy does not apply:
1. Under Coverage E — Personal Liability . . .
   e. To bodily injury or property damage arising out of any premises, other than an insured premises, owned, rented or controlled by any Insured.

The trial court, as we have said, held that the exclusions were not applicable and that the companies had not met the burden of proof in establishing the elements of exclusion. The judgment declared that liability coverage was afforded under the policies and directed the insuring companies to provide a defense and pay any judgment rendered against James Arrowood on behalf of Sandra Arrowood to the extent of the limits of coverage.

Each company has appealed that part of the judgment dealing with Exclusion f, asserting that the court erred in finding that liability coverage was not excluded under the policy for bodily injury which is either expected or intended from the standpoint of the insured. National Investors has also appealed that part of the judgment dealing with Exclusion e, asserting that it was error to find that coverage was not excluded under its policy for bodily injury arising out of any premises (other than the insured premises) owned, rented, or controlled by any Insured.

Appellants urge that the evidence points to only one possible conclusion, namely, that the injury to Sandra Arrowood was expected or intended by James Arrowood. When the facts and circumstances of this case are examined in their entirety, we believe that the scales tip decidedly toward an intentional injury and that no other hypothesis is reasonable. We hold, therefore, that the judgment of the trial court was clearly against the weight of the evidence. Neither side has cited any authority within this jurisdiction and our own research has produced nothing. Many cases from other jurisdictions do exist, wherein the courts have come to grips with whether particular conduct was intended or unintended within the language of insurance policies identical or similar to the language here. Other cases are of some benefit in dealing with the subject, but no two cases are factually identical and the lack of legal precedent in this type of problem is no real handicap. It is essentially a matter of gleaning the intent behind human transactions and the outcome is dependent on the judgment of common sense and experience as applied to human behavior.

A compendium of cases on the subject, except for the more recent decisions, appears in 2 A.L.R. 3d 1238. The general rule is that coverage exists under insuring contracts and exclusion clauses identical or similar to the one involved here for the unintended results of an intentional act, but not for damages assessed because of an injury which was intended to be inflicted.

The decision in *Lyons* v. *Hartford Insurance Group*, 125 N.J. Super. 239, 310 A. 2d 485 (1973) points out the distinction made by some courts, that is, even though an intentional act brings on an intentional result, if the injury to the specific individual was unintended, the coverage was held to exist. The case of *Smith* v. *Moran*, 61 Ill. App. 2d 157, 209 N.E. 2d 18 (1965) is typical of cases of this type where an insured fired multiple shots, intending to hit one Delores Nelson and in the process struck someone else, coverage was upheld. The decision states:

There are many decisions making this distinction, uniformly holding that there is coverage for unintended

results. For example: *Jackson* v. *Lajaunie*, 253 So. 2d 540 (La. App. 1971); *Marill* v. *Galliger*, 122 N.W. 2d 687 (Mich., 1963); *Lumbermen's Mutual Insurance Company* v. *Blackburn*, 477 P. 2d 62 (Oklahoma, 1970); *Smith* v. *Moran, supra; Putman* v. *Zeluff*, 127 N.W. 2d 374 (Mich., 1964); *Walker* v. *Champion*, 274 So. 2d 840 (La. App., 1973).

On the other hand, where the intentional act has resulted in intended injury, even where the injury inflicted is different or more severe than intended, coverage has been denied. [*Terito* v. *McAndrew*, 246 So. 2d 235 (La. App. 1971); *Mac Donald* v. *United Pacific Insurance Company*, 311 Pac. 2d 425 (Oregon, 1957); *Stout* v. *Grain Dealers Mutual Insuance Company*, 307 F. 2d 521 (4 Cir. 1962).]

Some decisions turn on the question of whether the actor intended both the act performed and the exact consequence which followed and under this view if the exact injury which resulted could be said not to have been the one intended, then insurance coverage was upheld.

The more recent cases and, we perceive, the better reasoned cases hold that if the performance of an intentional act causes an injury which may be said to be the natural and probable consequence of such an act, then the injury itself was intentional, even though it was not the injury intended.

Turning to the case at bar, we are not confronted with reconciling an intentional act with an unintended result, as in the case of *Smith* v. *Moran, supra.* The correlation between the injury here and the act of firing a pistol at point-blank range is so clear that no uncertainty can be entertained in that respect. The more searching issue centers on whether the initial act itself was intentional. Did James Arrowood intend to fire the pistol? If so, it is beyond any real dispute that the injury to Sandra was intentional.

We accept as valid appellant's argument that an express acknowledgement of intent from James is not required and that view is supported by the dictum of some decisions. *Allstate Insurance Company* v. *Hisely*, 465 F. 2d 1243 (10th Cir.

1972). We find no decisions suggesting that any such admission is required.

Thus, it becomes a matter of weighing all the facts and circumstances bearing on the incident in its entirety. *Great American Insurance Company* v. *Ratliff*, 242 F. 2d 983 (E.D. Ark. 1965). When that approach is undertaken, it is relevant to note those circumstances which we regard as persuasive of the conclusion we have reached: James did not want Sandra to date other men, whereas she did so and had had a date on the previous evening; James wanted to reconcile, but Sandra was doubtful; the circumstances that James carried a pistol, which he knew to be loaded, into the house to talk with Sandra about reconciliation and dating; that the pistol could not be fired except by pulling the trigger or pulling the hammer back; the fact that Sandra saw James holding the pistol as she turned around after being shot; the fact that Sandra preferred criminal charges because of the incident; of particular significance is James' demonstrated propensity for violence toward Sandra, repeated on numerous occasions, the most recent incident reportedly being the most severe. With respect to the March incident, in addition to being beaten, Sandra testified that James choked her and the fair inference to be drawn from her statements is that she was afraid James was going to kill her. It is not for us to try to fathom the forces that move some individuals at times to intentionally harm the objects they esteem, it is enough that the history of this case proves beyond any question that James Arrowood was capable of violent behavior toward Sandra Arrowood and the events of the morning of September 5 are consistent with that history. Further, while no firm conclusions can be founded upon it, even James' professed inability to remember any part of the incident, which we regard as credible, seems more consistent with a finding that the injury was intentional rather than accidental, as the human mind often obliterates from its memory behavior which it wants to disavow.

Of course, there are circumstances pointing in the other direction. We are mindful of James Arrowood's testimony that he did not intend to hurt or kill Sandra and appellees argue that there is no evidence that James intended to kill Sandra. As to the latter point, it is of no significance that

James may not have intended to kill Sandra, the issue is whether he intended to wound or injure her and the circumstances validating that conclusion have already been listed. Besides, James Arrowood's testimony is that he has no recollection of any part of the events of the shooting, so how can he say what his intention was at that exact moment if his memory is so lacking?

Of greater counter effect is the testimony of Sandra that James appeared startled and immediately said he was sorry and had not meant to do it. However, the inference to be drawn from these circumstances must yield to the inference to be drawn from those to the contrary and our own view is that the fact itself speaks more loudly than the professed regret. Perhaps James did immediately regret what had occurred, but that cannot erase what so plainly must have been intended at the moment of occurrence. It is pointless for us to try to explain irrational behavior in rational terms.

Without devoting further expression to this issue, it is enough to say that given two opposing interpretations, one accidental, the other intentional, we believe the evidence points convincingly and unerringly away from accidental and towards intentional, so much so, in fact, that the court's ruling to the contrary we regard as clearly against the evidence.

The decision reached on the first assignment of error renders the second assignment moot.

The case is reversed and remanded with instructions to enter a judgment consistent with this opinion.

HOWARD, J., dissents.