**COLORADO INTERSTATE GAS COMPANY, Plaintiff,**

v.

**NATURAL GAS PIPELINE COMPANY OF AMERICA and NGPL–Trailblazer, Inc., Defendants.**

**NATURAL GAS PIPELINE COMPANY OF AMERICA, Midcon Ventures, Inc., and NGPL–Trailblazer, Inc., Counterclaim-Plaintiffs,**

v.

**COLORADO INTERSTATE GAS COMPANY, Wyoming Interstate Company, Ltd., and the Coastal Corporation, Counterclaim-Defendants.**

No. C84–139–B.

United States District Court,
D. Wyoming.

May 29, 1987.

J. Kent Rutledge, Arthur Kline Lathrop & Uchner, Cheyenne, Wyo., Gary L. Cowan, P. Michael Koenig, Michael L. Beatty, Michael L. Williams, Rebecca H. Noecker, Colorado Springs, Colo., William C. McClearn, James E. Hartley, Marilyn S. Kite, Holland & Hart, Denver, Colo., for plaintiff.

John T. Cusack, Thomas Campbell, Gordon Nash, Gardner, Carton & Douglas Chicago, Ill., Paul J. Hickey, Rooney, Bagley, Hickey, Evans & Statkus, Cheyenne, Wyo., Louis Nizer, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, William Brown, Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo., Joseph M. Wells, Neil J. Maloney, Paul E. Goldstein, Lombard, Ill., Paul Korman, Gardner, Carton and Douglas, Washington, D.C., Roy R. Robertson, Jr., Midcon Corp., Lombard, Ill., for defendants; Phillip Areeda, Langdell Hall, Cambridge, Mass., of counsel.

Thomas A. Nicholas III, Hirst & Applegate, P.C., Cheyenne, Wyo., Michael L. Beatty, The Coastal Corp., Houston, Tex., for Coastal Corp.

Gerald M. Sterns, Charles Foster, Occidental Petroleum Co., Los Angeles, Cal., for Occidental.

## ORDER ON POST-TRIAL MOTIONS

BRIMMER, Chief Judge.

This matter came before the Court on defendants' motion, pursuant to Fed.R. Civ.P. 50(b) and 59, for judgment notwithstanding the verdict, for new trial, or for a remittitur. The Court, having heard the arguments of counsel, having reviewed the pleadings, and being fully advised in the premises, FINDS and ORDERS as follows:

Plaintiff Colorado Interstate Gas Company (CIG) and defendants, Natural Gas Pipeline Company of America and NGPL-Trailblazer, Inc. (hereinafter collectively referred to as "NGPL"), compete to transport natural gas. In July 1982, NGPL and CIG entered a contract (the Service Agreement) obligating CIG to deliver and requiring NGPL to purchase specified quantities of natural gas. The Service Agreement requires CIG to maintain sufficient gas reserves and pipeline transportation capacity to ensure delivery of NGPL's entitlements. Section 2 of the Service Agreement commits NGPL to purchase a minimum daily volume of gas or to pay the fixed costs of the volumes not taken.

In 1981–1982 a new pipeline, the Trailblazer System, was constructed to transport natural gas out of the Overthrust region of Wyoming. Three pipeline segments form the Trailblazer System: the Overthrust Pipeline, the Wyoming Interstate Company or WIC Pipeline, and the Trailblazer Pipeline. NGPL-Trailblazer owns the Trailblazer Pipeline in partnership with two other companies. NGPL-Trailblazer is the operator. Trailblazer competes with CIG to transport natural gas from the Overthrust.

In July 1983, NGPL refused to accept gas from CIG. The Natural Gas Act nevertheless obligated CIG to be ready to deliver any volumes requested by NGPL. CIG could not use the pipeline capacity reserved for NGPL to ship natural gas for other customers.

CIG was consequently unable to purchase gas from its own suppliers, so it shut-in gas owned by Champlin Petroleum in the Whitney Canyon area of Wyoming. Champlin and CIG began renegotiating their contract. Champlin insisted that CIG release its rights to purchase Whitney Canyon gas. CIG acceded. The next day, NGPL bought Champlin's Whitney Canyon gas, although NGPL still refused deliveries from CIG. NGPL shipped the Whitney Canyon gas through the Trailblazer Pipeline. In addition to acquiring Champlin's Whitney Canyon reserves, NGPL purchased gas from new suppliers and increased its takes from existing gas suppliers.

CIG brought this action alleging that NGPL attempted to monopolize the market for the long-distance transportation of Wyoming natural gas, that NGPL conspired to monopolize that market, that NGPL breached the Service Agreement and its duty of good faith and fair dealing, and that NGPL tortiously interfered with CIG's business relationship with Champlin. NGPL asserted counterclaims alleging that CIG's parent, the Coastal Corporation (together with CIG and WIC), monopolized, attempted to monopolize and conspired to monopolize the purchase, transportation and sale of natural gas in the Overthrust area. NGPL also alleged that Coastal acquired and attempted to acquire competitors in violation of §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act.

At trial CIG abandoned its antitrust conspiracy claim against NGPL. The Court directed a verdict for CIG on NGPL's conspiracy counterclaim. A directed verdict was also rendered against NGPL on its claims that CIG monopolized and attempted to monopolize the sale of natural gas and that Coastal unlawfully acquired competitors. After an eight week trial, the jury retired to consider:

1. whether NGPL breached the Service Agreement, tortiously interfered with CIG's business or contractual relationships, and attempted to monopolize the long-distance transportation of Wyoming gas; and
2. whether Coastal, CIG and WIC monopolized and attempted to monopolize the purchase and transportation of natural gas.

The jury rejected NGPL's counterclaims and found in favor of CIG on each cause of action. CIG was awarded $159,797,156 on its breach of contract claim, $175,001,711 on its antitrust claim and $39,231,072 on its tortious interference claim. The total award reached $724,033,361 after trebling the antitrust damages. The Court, however, determined that the damages were duplicative and reduced the judgment to $549,031,650 by deleting the damage award for breach of contract. NGPL now seeks judgment notwithstanding the verdict on each of CIG's successful claims. In the alternative NGPL moves for a new trial or for a remittitur.

Substantial evidence supports the jury's verdict, and NGPL's motions for judgment notwithstanding the verdict or new trial are denied. The Court concludes, however, that the jury erroneously awarded CIG $16,017,678 as damages for tortious interference with contract, and the Court will grant a remittitur in this amount. The jury also awarded CIG its future F–1 lost profits as antitrust damages. The total amount of future lost profits was $60,388,000, which was trebled to $181,164,000. The jury erred in awarding CIG its future F–1 lost profits as antitrust damages but correctly included them as damages for breach of contract. Therefore, the Court will grant a remittitur in the amount of $181,-164,000 but reinstate the breach of contract damage award in the amount of $60,388,-000. The total amount of the remittitur is $197,181,678.

## I. JUDGMENT NOTWITHSTANDING THE VERDICT

 Caution must be exercised in granting judgment notwithstanding the verdict because it deprives the prevailing party of the jury's factual determination. *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 680 (10th Cir.1981). Granting the motion is appropriate only when the evidence points one way and no reasonable inferences support the position of the opposing party. *Equal Employment Opportunity*

*Comm'n v. Prudential Fed. Sav. and Loan Ass'n*, 763 F.2d 1166, 1171 (10th Cir. 1985) (citing *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir.1974)), *cert. denied*, — U.S. —, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985). The evidence and accompanying inferences must be viewed in a light most favorable to the prevailing party. The court may not weigh the evidence, consider the credibility of witnesses or substitute its judgment for the jury's. *Joyce v. Atlantic Richfield Co.*, 651 F.2d at 680 n. 2. The proof favoring the movant must be so overwhelming that judgment notwithstanding the verdict is the only option available to the court. *Acree v. Minolta Corp.*, 748 F.2d 1382, 1387 (10th Cir.1984). If fairminded people may differ as to the conclusions or if there is substantial conflicting evidence, judgment notwithstanding the verdict must be denied. *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir.1987) (citing *Wylie v. Ford Motor Co.*, 502 F.2d 1292 (10th Cir.1974)).

The jury's determination must nevertheless be supported by substantial evidence. *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983). Substantial evidence is relevant evidence found in the record as a whole which reasonable minds might accept as adequate to support the conclusion. *Allstate Ins. Co. v. Hiseley*, 465 F.2d 1243, 1247 (10th Cir.1972). The court must determine whether a rational jury could conclude that each required element of the claim was met. *Downie v. Abex Corp.*, 741 F.2d 1235, 1238 (10th Cir. 1984). The jury's findings on sharply conflicting evidence, however, are conclusively binding, for the jury is charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given their testimony. *Ryder v. City of Topeka*, At 1420–21 (quoting *White v. Conoco, Inc.*, 710 F.2d 1442 (10th Cir.1983)).

## A. Attempt to Monopolize

An attempt to monopolize requires proof of four elements: (1) a relevant market; (2) a dangerous probability of success; (3) specific intent to monopolize; and (4) conduct in furtherance of the attempt. *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.*, 783 F.2d 159, 161

(10th Cir.1986). Private plaintiffs must also show antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). NGPL urges that the evidence was insufficient to permit a reasonable jury to conclude that CIG established the essential elements of an attempt to monopolize. BRIEF OF NATURAL GAS PIPELINE COMPANY OF AMERICA IN SUPPORT OF MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT, NEW TRIAL AND/OR REMITTITUR at 9 (hereinafter cited as "NGPL Brief").

### 1. Antitrust Injury

Private plaintiffs must prove antitrust injury to recover treble damages. *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. CIG failed to prove antitrust injury, NGPL contends, because CIG's injury does not flow from diminished competition in the market for the transportation of natural gas and because the damages awarded by the jury do not reflect any anticompetitive effect of the violation. NGPL characterizes CIG's claim of antitrust injury as one for lost profits under the Service Agreement, a loss for which the antitrust laws do not afford relief. Even if such losses were cognizable, NGPL argues, CIG failed to connect its lost profits to its antitrust claim.

CIG claims that NGPL's conduct injured competition. The shut-in, tie-up and manipulation of takes was designed to establish control of the market and to achieve monopoly. Competition was injured, CIG argues, because the marketplace was deprived of a low-cost transportation alternative. The shut-in precluded CIG from competing with the Trailblazer System to transport NGPL's gas and prevented CIG from providing noninterruptible transportation services to other pipelines. Consumers and producers, CIG concludes, thus had to pay higher prices to transport Wyoming gas.

The United States Supreme Court defines antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick*,

429 U.S. at 489, 97 S.Ct. at 697. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. *Id.* It should be the type of loss that the claimed violation would be likely to cause. *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)).

The antitrust injury test is ambiguous. Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U.Chi.L.Rev. 467 (1980). Two recent United States Supreme Court cases help to clarify the concept of antitrust injury.

Plaintiff in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), was a health insurance subscriber whose benefits included reimbursement for psychiatrists' fees but not psychologists' fees. Plaintiff alleged that Blue Shield conspired with psychiatrists to drive psychologists from the health care market. The district court dismissed the case, holding that plaintiff lacked standing because she was not a competitor in the health care market. The court of appeals reversed. It held that treble damages are available to any person whose injury is directly or proximately caused by a violation of the antitrust laws. *Id.* at 468–72, 102 S.Ct. at 2542–44.

On appeal the Supreme Court addressed the doctrines of standing and antitrust injury. With regard to the latter, the Court embraced the view that recovery of treble damages should be linked to the procompetitive policy of the antitrust laws. *Id.* at 482, 102 S.Ct. at 2550. At the same time, it rejected the claim that *Brunswick* limits recovery to those plaintiffs who show that their injuries reflect the anticompetitive effect of the violation. *Id.* The Court held that plaintiffs demonstrate antitrust injury where their injuries are "inextricably intertwined with the injury the conspirators sought to inflict on ... the market." *Id.* at 483–84, 102 S.Ct. at 2550–51. The Court also said that a plaintiff need not prove an actual lessening of competition or that it was driven from the market. *Id.* at 482,

102 S.Ct. at 2550 (quoting *Brunswick*, 429 U.S. at 490 n. 14, 97 S.Ct. at 698). Two facts distinguished *McCready* from *Brunswick*. First, plaintiff alleged a purposefully anticompetitive scheme. Second, plaintiff did not label increased competition as a harm to her. *Blue Shield of Virginia v. McCready*, 457 U.S. at 483 & n. 19, 102 S.Ct. at 2550 and n. 19. The Court finally noted that "the relationship between the claimed injury and that which is unlawful in the defendant's conduct, as analyzed in *Brunswick*, is *one factor* to be considered in determining the redressability of a particular form of injury under § 4." *Id.* at 483 n. 19, 102 S.Ct. at 2550 n. 19 (emphasis added).

The additional factors to be considered became clear in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In that case, a carpenters' union sued an association of general contractors, alleging that the association influenced its members and third parties to withhold their business from unionized firms in order to restrain the union's business activities. *Id.* at 521–23, 103 S.Ct. at 899–900. The question presented was whether the union could recover for injuries resulting from the association's coercion of third parties. *Id.* at 535, 103 S.Ct. at 907. The Court held that the union lacked standing to seek treble damage. *Id.* at 545–46, 103 S.Ct. at 912.

The Court evaluated plaintiff's harm, the alleged wrongdoing and the relationship between them. *Id.* at 535, 103 S.Ct. at 907. Several factors were examined: the causal connection between the violation and the injury, defendant's intent to cause the harm, whether Congress intended to redress the injury, the existence of a class of persons more directly injured by the violation, the directness of the causation between the violation and the injury, the degree to which the claim was speculative, the availability of other more appropriate remedies, and the judicial interest in managing complex litigation and avoiding double recovery. *Id.* at 537–44, 103 S.Ct. at 908–11.[1]

1. While *Associated General Contractors* is a standing case, it aids in analyzing CIG's claims.

*McCready* and *Associated General Contractors* thus suggest that many factors must be considered in a proper analysis of antitrust injury. In this case, CIG alleged that NGPL attempted to monopolize the long-distance transportation of natural gas by excluding CIG from the market. Three issues are raised: whether a reasonable jury could conclude that CIG was excluded from the market, whether the alleged injury is redressable under the antitrust laws, and whether a reasonable jury could conclude that the violation and the injury were connected.

The Court must view the evidence as a whole and follow the admonition that an antitrust plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n. 18 (10th Cir.1984) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)), *aff'd*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

■ Viewed as a whole and in a light most favorable to CIG, ample evidence supports the jury's determination that CIG was excluded from the market. CIG's theory of attempted monopolization is built on several related acts. The first step was the shut-in of CIG gas at the H–1 delivery point. This closed off the southern outlet for Wyoming gas. CIG, to cut back its own supplies, reduced takes from Northwest Pipeline, which was buying substantial amounts of natural gas in Wyoming and transporting it to the south and east through CIG's system. Northwest Pipeline sent the gas to the Seattle market to avoid transporting it through the Trailblazer System at a higher cost or breaching its contracts with its own suppliers. This in turn saturated the Seattle market, where Canadian natural gas was plentiful. The shut-in thus closed off the outlet for Wyoming gas in the Northwest. Because the Northwest Central and Kansas-Nebraska pipelines stop short of the Overthrust, closing the northwest and southeast outlets left one transportation alternative for Wyoming natural gas: the Trailblazer System. Tr. at 1550–55; 1693–94. CIG had difficulty obtaining new business, because the Service Agreement compelled CIG to stand ready to deliver if NGPL resumed takes. When CIG found new customers, the ANR and Tennessee pipeline companies, NGPL resumed takes, forcing CIG to interrupt its service and to lose its new customers. Then NGPL again suspended its takes. Tr. at 1511–20. Although NGPL vigorously disputed this theory at trial, the jury could have concluded that CIG was excluded from the market for the long-distance transportation of Wyoming natural gas.

■ An attempted monopolization need not cause actual market damage, but must simply threaten to produce the type of market damage contemplated by the antitrust laws. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 270 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). The jury could have concluded that competition actually diminished. Evidence was presented showing that, following the shut-in, NGPL's market share for the long-distance transportation of Wyoming natural gas rose from approximately forty-two percent to fifty-five percent, while CIG's share dropped from twenty-three percent to thirteen percent. Tr. at 1505–09; Plaintiff's Exhibit 1758.

The next question is whether lost profits caused by exclusion from the market is an injury which the antitrust laws are intended to prevent. *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. Congress intended to preserve competition by enacting the antitrust laws. *Id.* at 488, 97 S.Ct. at 697. Preserving competition in turn promotes maximum consumer economic welfare through effi-

The concepts of standing and antitrust injury are similar, and many courts have incorporated *Brunswick* into their standing tests. *See, e.g., John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir.1977). Justice Marshall, the author of *Brunswick*, described that opinion as one denying standing. *Associated General Contractors*, 459 U.S. at 549 (Marshall, J., dissenting).

cient use and allocation of scarce resources. I P. Areeda & D. Turner, *Antitrust Law* ¶ 103, at 7 (1978). Antitrust injury narrows the standard for recoverable damages to those actually flowing from antitrust violations that cause market inefficiency. Page, *supra,* 47 U.Chi.L.Rev. at 471. Firms may exclude competitors and yet increase efficiency. The mere fact that a firm has been foreclosed from selling does not, in an economic sense, necessarily mean that it suffered antitrust injury. *Id.* at 484, 97 S.Ct. at 695. One principle *Brunswick* may support is that reductions in profit attributable to conduct preserving allocative efficiency or increasing productive efficiency cannot be recovered as damages. *Id.* at 485, 97 S.Ct. at 695.

■■■ Evidence was presented in this case that the Trailblazer System's transportation costs substantially exceeded those of the CIG system. Tr. at 1569–78. The evidence thus supports an inference that a lower-priced competitor was excluded in favor of a higher-priced competitor without a corresponding increase in allocative or productive efficiency. The jury could thus conclude that NGPL's conduct was anticompetitive and redressable under the antitrust laws.

CIG's injury flows from that which makes the defendant's acts unlawful and reflects the anticompetitive effects of the violation. *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. Competition was injured by the exclusion of a low-cost competitor from the market. CIG's exclusion resulted in higher prices to producers, shippers and consumers of natural gas. An increase in price resulting from dampened competitive market forces is redressable under § 4. *Blue Shield of Virginia v. McCready,* 457 U.S. at 482–83, 102 S.Ct. at 2550. CIG also experienced lost profits. Increased prices and lost profits are likely to be caused by the exclusion of a lower-priced competitor. CIG thus proved the type of loss that the claimed violation would be likely to produce. *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697.

The third issue is whether the jury reasonably could have concluded that CIG's injury flowed from NGPL's violation. NGPL argues that CIG failed to connect its lost profits to its antitrust claim. NGPL purchased natural gas from CIG, not transportation services. It thus argues that CIG's lost profits resulted from lost sales to NGPL (as opposed to lost opportunities to transport Wyoming natural gas) and that CIG failed to prove that it lost profits on the transportation of Wyoming natural gas. NGPL therefore reasons that CIG failed to prove that it lost profits in the market for the long-distance transportation of Wyoming natural gas.

■■■ The testimony of CIG's damage expert, Dr. Rhodes, belies NGPL's assertion that CIG's lost profits are unconnected to the long-distance transportation of natural gas. Dr. Rhodes testified that he examined CIG's variable costs, fixed costs and return on investment. Variable costs are the costs of acquiring and selling gas to other companies. Fixed costs are the costs of building and maintaining a pipeline. Return on investment is the owner's return of equity. Dr. Rhodes excluded variable costs from the calculation of lost profits. Tr. at 2556–58. Excluding variable costs eliminated lost sales of natural gas from the damage calculation. Dr. Rhodes calculated past lost profits by subtracting F–1 fixed costs from H–1 fixed costs and multiplying the difference by the volumes not taken. Tr. at 2561. Subtracting F–1 from H–1 excludes field natural gas from the damage calculation and thus only measures CIG's transportation costs. CIG's past lost profits measure the profits its assets would have generated but for the antitrust violation. They are therefore related to the expected gain resulting from the attempt to monopolize. Because they represent the potential return on output of a competitor excluded from the market, lost profits are an appropriate measure of antitrust injury. Page, *supra,* 47 U.Chi.L.Rev. at 486–87. The jury therefore could reasonably conclude that CIG's past lost profits were connected to the long-distance transportation market. *But see infra* text at 1479–80 for a discussion of future lost profits.

Turning to the contention that CIG failed to show that it suffered lost profits from the transportation of Wyoming natural

gas, evidence was presented that the movement of Wyoming gas through the CIG system to the H–1 delivery point depended on NGPL accepting delivery of that gas. All movement of Wyoming gas stopped when NGPL refused to take natural gas at the H–1 delivery point. The transportation of Wyoming natural gas is thus inextricably tied to the injury NGPL sought to inflict on CIG and the market. The jury could have concluded that CIG established that it lost profits on the sale of Wyoming natural gas and that CIG's injury flowed from the defendant's unlawful act. *Blue Shield of Virginia v. McCready*, 457 U.S. at 484, 102 S.Ct. at 2551.

NGPL argues that the shut-in and tie-up of CIG's pipeline capacity did not injure competition because CIG was not driven out of business. As the Court in *Brunswick* noted, however, plaintiffs seeking treble damages need not "prove an actual lessening of competition in order to recover.... [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Id.* at 489 n. 14, 97 S.Ct. at 698 n. 14.

*Associated General Contractors* further bolsters the jury's verdict. Substantial evidence supports the jury's conclusion that the antitrust violation and CIG's injury were causally related and that Congress intended to remedy the type of injury CIG suffered. CIG alleged, and the jury found, that NGPL specifically intended to harm CIG. No other class of persons was more directly injured and thus in a better position to enforce the antitrust laws. The claim is not speculative as that term was used in *Associated General Contractors*.[2] CIG presented evidence that its share of the market declined because of the shut-in, resulting in lost profits. Unlike *Associated General Contractors*, where the union could resort to the labor laws for redress, CIG lacked an alternative remedy. The jury's verdict is thus consistent with *Associated General Contractors*.

The verdict is also consistent with *Brunswick*. At issue in *Brunswick* was whether damages are recoverable for lost profits incurred when a competitor remains in business. *Id.* at 484, 97 S.Ct. at 695. The Court observed that the injury claimed was inimical to the purpose of the antitrust laws. *Id.* at 488, 97 S.Ct. at 697. Central to this conclusion was that plaintiff sought damages for increased competition. *Id.* In contrast, CIG claimed that its lost profits flowed from a purposeful scheme to diminish competition. Further, CIG established actual injury in fact, whereas the plaintiff in *Brunswick* merely showed the loss of an expected windfall. *Id.* Finally, unlike the situation in *Brunswick*, damages are not an anticompetitive remedy. The jury's award of damages warns firms against excluding lower-priced competitors from the market by predatory conduct and thereby encourages stronger competition. *See* II P. Areeda & D. Turner, *Antitrust Law* ¶ 346, at 246–47 (1978).

The jury was instructed that CIG was required to prove a causal connection between the antitrust violation and injury to its business. Jury Instruction No. 42. The instruction also required the jury to find that the type of injury was one which the antitrust laws were intended to prevent and that the injury was attributable to some harm to competition. *Id.* The jury is presumed to follow the instructions given by the trial court. *United States v. Hall*, 805 F.2d 1410, 1417 (10th Cir.1986). Substantial evidence supports the jury's finding that CIG proved antitrust injury, and judgment notwithstanding the verdict cannot be granted on this ground.

**2. Relevant Market**

NGPL contends that CIG incorrectly defined the relevant market. The relevant market consists of the relevant product market and the relevant geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Aspen Highlands Skiing Corp.*

---

**2.** In *Associated General Contractors*, the union failed to allege that any collective bargaining agreement was broken as a result of the violation, that the share of the market controlled by unionized firms had diminished, that union membership declined, or that its revenues decreased. *Associated General Contractors*, 459 U.S. at 542.

*v. Aspen Skiing Co.*, 738 F.2d 1509, 1528 (10th Cir.1984), *aff'd*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). NGPL apparently concedes that Wyoming natural gas is the relevant product but disputes CIG's definition of the relevant market as the long-distance market for the transportation of that gas. NGPL also argues that the Court erred by instructing the jury on CIG's theory of the relevant market.

■ The relevant geographic market is the geographic area in which sellers and buyers of products or services do business. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961); *United States v. Grinnell Corp.*, 384 U.S. 563, 588–89, 86 S.Ct. 1698, 1712–13, 16 L.Ed.2d 778 (1966) (Fortas, J., dissenting). The boundaries of the relevant market must correspond to the commercial realities of the industry and be economically significant. *Brown Shoe Co. v. United States*, 370 U.S. at 336–37, 82 S.Ct. at 1529–30.

■ CIG claimed that the relevant market was the long-distance market for transportation of Wyoming gas from producing areas within Wyoming and the Overthrust to points of interconnection with major interstate trunklines. NGPL contends that the relevant market must include local transportation to cities such as Denver and Salt Lake City. NGPL submitted data showing that substantial volumes of gas produced in the Overthrust were consumed in Wyoming, Colorado and Utah. Tr. at 7453; Defendants' Ex. 2060. CIG offered evidence that, by the early 1980s, production of natural gas in the Overthrust outstripped local consumption. Tr. at 1453–67; Plaintiff's Ex. 1754, 1755, 1756. Although NGPL's expert, Dr. George R. Hall, challenged CIG's definition of the relevant market, he testified that by 1983 production exceeded local consumption by 266 billion cubic feet. Tr. at 7454. CIG thus argued that transportation to local markets did not afford a real choice to producers and shippers of Wyoming gas, because demand was greater in midwestern and eastern markets.

In *United States v. Grinnell Corp.*, 384 U.S. 563, 575, 86 S.Ct. 1698, 1706, 16 L.Ed.2d 778 (1966), the Supreme Court de-

termined that the relevant geographic market for fire and burglary protection services provided by defendants' central stations was a national market, although the individual stations only served areas within a twenty-five mile radius. The Court reasoned that "the business of providing such services is operated on a national level" and that the "national market ... reflects the reality of the way ... [defendants] built and conduct their services." *Id.* at 575, 576, 86 S.Ct. at 1706. In reaching this conclusion, the Court looked to the existence of national planning, agreements covering activities in many States, the multistate nature of the business, and the existence of nationwide inspection, certification and rate-making. *Id.* at 575, 86 S.Ct. at 1706.

In this case, the jury heard evidence that natural gas pipeline companies conduct interstate business subject to national setting of prices, rates and terms by the Federal Energy Regulatory Commission (FERC). The Service Agreement covered activities in many States. NGPL's stated objective for the Trailblazer System was to "move natural gas from the Overthrust Area of Wyoming to interconnections with existing major interstate pipeline systems for delivery of substantial quantities of Rocky Mountain gas to eastern and mid-western markets." As in *Grinnell*, the jury could reasonably conclude that CIG's definition of the relevant market corresponded to the commercial realities of the industry and was economically significant.

■ The determination of the relevant market is normally a question of fact. *Telex Corp. v. International Business Mach. Corp.*, 510 F.2d 894, 915 (10th Cir.) (per curiam), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). Where each party presents substantial evidence concerning the appropriate relevant market, the issue becomes a jury question. *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242, 246 (10th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). NGPL contends, however, that the relevant market instruction

tainted the jury's finding. NGPL Brief at 20–21.

This argument is without merit. Counsel failed to apprise the Court of its objection before the jury retired. Further, NGPL's proposed instruction on the relevant market included language almost identical to that which it now describes as erroneous.

■■■■■ Error may not be assigned to the giving of an instruction unless, before the jury retires, the objecting party raises an objection and distinctly states "the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51. The objection must be sufficiently specific to bring into focus the precise nature of the alleged error. *Rogers v. Northern Rio Arriba Elec. Coop., Inc.*, 580 F.2d 1039, 1042 (10th Cir.1978). At the instruction conference, NGPL objected to the organization of the relevant market instruction and recommended moving one of the paragraphs in the instruction. The Court accepted this suggestion, and counsel indicated that the instruction was acceptable. Tr. at 8468–70. NGPL now asserts that the instruction invited the jury to define the relevant market as the long-distance transportation of natural gas. NGPL Brief at 20. Under these circumstances, the Court was not apprised of NGPL's present position before instructing the jury.

NGPL's present objection also overlooks its earlier representations to the Court. The instruction given to the jury said that "Colorado Interstate claims that the relevant service market is the transportation of natural gas from producing areas to interconnections with major interstate trunklines." Jury Instruction No. 30. NGPL's proposed instruction stated that "Colorado Interstate claims that the relevant market is the long-distance transportation of natural gas from producing areas within the state of Wyoming and the Overthrust region." DEFENDANTS' AND COUNTERCLAIM PLAINTIFFS' THIRD SET OF REVISED AND SUPPLEMENTAL JURY INSTRUCTIONS, NATURAL'S FIRST PROPOSED INSTRUCTION NO. 25 [Relevant Market]. NGPL's proposed instruction is virtually identical to the charge to the jury.

Finally, the instruction is not patently erroneous or prejudicial. *See Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F.2d 917, 925 (10th Cir.), *cert. denied*, 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984) (jury instruction reviewed under a plainly erroneous standard where objection not tendered before jury retires). The instruction incorporates the applicable legal standards. Substantial evidence supports the jury's conclusion that CIG proved the existence of a relevant market. Judgment notwithstanding the verdict is inappropriate in these circumstances.

### 3. Dangerous Probability of Success

■■■■ A dangerous probability of success is the probability of attaining the power to control prices and exclude competition in the relevant market. *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.*, 783 F.2d 159, 162 (10th Cir.1986). NGPL contends that FERC's regulation of natural gas pipelines precludes a dangerous probability of success as a matter of law. It also claims that the jury's finding of a dangerous probability of success is against the weight of the evidence.

■■■■■ FERC's control of prices and market entry, NGPL argues, prevents any pipeline from controlling prices and excluding competition. The Natural Gas Act, however, does not insulate companies within its purview from the antitrust laws. *California v. Federal Power Comm'n*, 369 U.S. 482, 485–86, 82 S.Ct. 901, 903–04, 8 L.Ed.2d 54 (1962). Antitrust liability may arise despite the existence of pervasive regulatory control. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973).

Two cases suggest that agency regulations may foreclose a probability of successful monopolization. In *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 354 (5th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), the court determined that a municipal power company lacked the power to control prices and exclude competition. The defendant power company was the

only franchised electric utility in the Houston area and constituted a "natural monopoly for the distribution of electric power." *Id.* at 345. In contrast, CIG and NGPL compete within the same market. As the court noted, violations of the antitrust laws can occur when regulated industries actually compete and anticompetitive activity surfaces. *Id.* at 354–55. Because neither CIG nor NGPL holds the sole franchise for transportation of natural gas from the Overthrust, the jury's finding of dangerous probability of success is consistent with *Almeda Mall.*

*Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.,* 615 F.2d 1372, 1375–76 (5th Cir.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980), arose from the defendant's refusal to provide interconnections to a smaller local competitor. The court said that the existence of regulatory control is relevant to the existence of monopoly power and "may even prohibit a finding of such power as a matter of law." *Id.* at 1386–87. The court held, however, that the regulatory scheme is relevant evidence of monopoly power. *Id.* at 1386. Whether the defendant possessed such power is a jury question. *Id.* The mere fact of extensive federal regulation thus does not immunize NGPL from antitrust liability.

■ Regulation of the industry is nevertheless relevant evidence of the power to control prices and exclude competition. *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1105–06 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). FERC's role in this case surfaced early in the trial. The first witness, Mr. O'Connell, indicated that FERC regulates the industry. Tr. at 211–12. He was extensively cross-examined on the course and outcome of FERC proceedings. Tr. at 578–97. The record is replete with testimony concerning FERC orders. Witnesses were permitted to explain their understanding of FERC orders to the extent they relied on those orders in taking action or forming opinions. *See, e.g.,* testimony of Dr. Leitzinger, Mr. Morgan, Dr. Rhodes, Mr. Grubb, Mr. Kitchens, Mr. McElligott, Mr. Morrow, Mr. Oxford, Mr. Lawrence, Dr. Hall. NGPL thoroughly explored FERC Regulations and FERC Order 380 during its cross-examination of Mr. Morgan. Tr. at 2328–34, 2391–94. Testimony about FERC was excluded only when unduly prejudicial or barred by Fed.R.Evid. 201. The existence of the regulatory scheme was thus presented to the jury.

NGPL did not request, or object to the absence of, jury instructions stating that FERC's regulatory authority should be considered in determining the existence of a dangerous probability of success. *See Castleberry v. NRM Corp.,* 470 F.2d 1113, 1120 (10th Cir.1972) (plaintiff's failure to request jury instruction on one theory of liability, coupled with the statement that counsel did not object to defendant's instructions, precluded appeal of court's failure to instruct jury on omitted theory of liability). NGPL objected to the instruction given on the ground that NGPL's market share was insufficient to permit a finding of dangerous probability of success. Tr. at 8476–81. NGPL sought a directed verdict on the ground that CIG failed to prove a dangerous probability of success. The reasoning was that NGPL possessed an insufficient market share. Regulatory control by FERC was not mentioned. Tr. at 8381–84. NGPL did not assert its present position at trial.

■ FERC's authority over CIG and NGPL does not, as a matter of law, preclude a finding that NGPL possessed the power to control prices and exclude competition. Even if it did, NGPL failed to raise the issue during trial. *See Glasscock v. Wilson Constructors, Inc.,* 627 F.2d 1065, 1068 (10th Cir.1980) (a party may not complain of error which it induced or invited); *Rogers v. Northern Rio Arriba Elec. Coop., Inc.,* 580 F.2d 1039, 1042 (10th Cir. 1978) (the purpose of Fed.R.Civ.P. 51 is to clarify the objecting party's position and give the trial court an opportunity to make changes). The remaining issue is whether the jury's finding of a dangerous probability of success is against the weight of the evidence.

A dangerous probability of success may be shown by market power which in turn

may be demonstrated through market share, expressed as a percent of the relevant market. *Shoppin' Bag*, 783 F.2d at 161. Determining market power also requires an examination of the defendant's market strength as measured by the number and strength of its competitors, ease of market entry, consumer sensitivity to changes in price, innovations in the market and whether the defendant is a multimarket firm. *Id.* at 162. Some proof of overt predatory conduct is also required. *Id.* at 163.

CIG calculated market shares based on capacity control of the Trailblazer System (but excluded the WIC pipeline). The owners of the three pipeline segments contributed to the project's construction. In return each received ownership shares. They also received a share of the Trailblazer System's total pipeline capacity in proportion to the amount of debt assumed. Capacity control, factored for the system's different pipeline sizes, constituted each party's market share. Using this method, NGPL's market share was over 50 percent. Tr. at 1479-95. NGPL argued that CIG's methodology skews the parties' positions in the market. It calculated market share based on each partner's ownership of the Trailblazer System. By this method, NGPL's market share is only 33 percent.

 The central issue is the defendant's economic power in the relevant market. *E.J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 306 (10th Cir.1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976). Actual ownership of the Trailblazer System is one measure of economic power in the market for the long-distance transportation of Wyoming natural gas. Control of the system's overall transportation capacity is an equally valid indicator, especially when coupled with evidence showing that volumes passing through the Trailblazer System increased substantially following the shut-in. Tr. at 1585-87; Plaintiff's Ex. 1763. Sufficient evidence was thus presented from which the jury could conclude that NGPL possessed more than a 50 percent share of the relevant market.

Factors besides market share must be considered. *Shoppin' Bag*, 783 F.2d at 162. CIG's evidence of the parties' strength showed that, prior to the shut-in, NGPL controlled 41 percent of the market compared with CIG's 23 percent share. After the shut-in, CIG controlled 13 percent while NGPL's share rose to 54 percent. Plaintiff's Ex. 1758. NGPL's studies showed that CIG controlled nearly 81 percent of the pipeline capacity coming out of Wyoming. Tr. at 6468-69; Defendants' Ex. 3094. The evidence also showed that FERC regulations made market entry difficult. Finally, at the time of the shut-in, demand for natural gas was declining. One of Champlin Petroleum's gas contract managers, Mr. Gordon Daty, testified that NGPL was the only firm interested in Champlin's Whitney Canyon reserves following CIG's release. As a consequence, Champlin received a lower price for Whitney Canyon gas. NGPL then increased its transportation charges for that gas. Tr. at 4328-35. The jury thus could have concluded that the relevant market was vulnerable to control of prices. Evidence was also presented that CIG was excluded from the market by NGPL's aggressive conduct. *See supra* text at 1460-61.

 The existence of a dangerous probability of success is a jury question. *Mid-Texas Communications Systems, Inc. v. American Tel. & Tel. Co.*, 615 F.2d at 1387. The jury apparently rejected NGPL's market share data and accepted CIG's. The weight of the evidence supports the jury's finding that NGPL possessed the power to control prices and exclude competition. That evidence showed NGPL's aggressive conduct, CIG's exclusion from the market, the market's vulnerability to increases in transportation prices and that prices actually increased. This constitutes sufficient evidence from which the jury could conclude that CIG proved a dangerous probability of success by a preponderance of the evidence.

### 4. Specific Intent to Monopolize and Anticompetitive Conduct

 A violation of § 2 of the Sherman Act requires a specific intent to monopolize. *United States Steel Corp. v.*

*Fortner Enter. Inc.,* 429 U.S. 610, 612 n. 1, 97 S.Ct. 861, 863 n. 1, 51 L.Ed.2d 80 (1977); *Shoppin' Bag,* 783 F.2d at 161. A desire to increase market share is insufficient. *United States Steel Corp. v. Fortner Enter. Inc.,* 429 U.S. at 612 n. 1, 97 S.Ct. 863 n. 1. A defendant must act with specific intent to destroy competition or build a monopoly. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). Specific intent to monopolize is defined as an intent to acquire market power and exclude others from competition. *E.J. Delaney Corp. v. Bonne Bell, Inc.,* 525 F.2d at 306 (quoting *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561, 586 (10th Cir.1961)).

 Proof of exclusionary intent requires evidence that a business intends to use or does use unfair weapons. *Pacific Eng'g & Prod. Co. of Nevada v. Kerr-McGee Corp.,* 551 F.2d 790, 795 (10th Cir. 1977). Specific intent may be proved by direct evidence or inferred from a firm's anticompetitive conduct. *Aspen Skiing Co. v. Aspen Highlands Skiing,* 472 U.S. 585, 608 n. 39, 105 S.Ct. 2847, 2860 n. 39, 86 L.Ed.2d 467, 484 n. 39 (1985) (quoting R. Bork, *The Antitrust Paradox* 157 (1978)). Absent direct evidence of specific intent to monopolize, defendant's conduct must substantially restrain trade, clearly threaten competition or be clearly exclusionary. *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710 F.2d 1366, 1374 (9th Cir.1983) (quoting *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1028 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982)). Specific intent may not be inferred from activities motivated solely by legitimate business considerations. 16B *Business Organizations,* J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 9.02[5] (1986).

 The issues are whether a jury could reasonably find that NGPL specifically intended to monopolize the relevant market and, if so, whether NGPL's activities were motivated solely by legitimate business considerations. The relevant factors in examining these questions are whether the acts are ordinary business practices typical of those used in a competitive mar-

ket and whether the acts constitute an attempt to acquire monopoly power. *Telex Corp. v. International Business Mach. Corp.,* 510 F.2d 894, 925–26 (10th Cir.) (per curiam), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

CIG's evidence of specific intent to monopolize came partly from internal NGPL memoranda. In June 1983, CIG proposed to change the H–1 delivery point from Texas to the entry point of the Trailblazer Pipeline. The change would have freed the southern part of CIG's system from the effects of the shut-in. Tr. at 1540–41. Mr. Hannig, a project analyst for NGPL, observed that "[t]here are many implications involved in making this switch," including whether "this [would] free-up capacity on CIG's system so they could transport for others." Plaintiff's Ex. 1325. In August 1984, CIG invited NGPL to change or "renominate" the volumes of natural gas NGPL was entitled to receive under the Service Agreement. A smaller nomination by NGPL would have reduced CIG's obligation to deliver natural gas to NGPL and thus increased CIG's capacity to serve other customers. Tr. at 1544. In a memorandum to Mr. Eberst, NGPL's Vice-President for Marketing and Rates, Mr. Wozbut, NGPL's Rate Coordinator, recognized that "nominations of entitlements determine whether CIG's system can satisfy customer requirements on a supply and capacity basis." Plaintiff's Ex. 763. The renomination proposal forced NGPL to "determine the status of CIG as a continuing supply source and possibly as a major competitor for Rocky Mountain gas. Management must determine whether ... freeing up of CIG capacity may hinder Natural in any of its endeavors." *Id.* NGPL nominated its full capacity under the Service Agreement yet refused to accept delivery of natural gas when the nomination became effective. Tr. at 8260; Plaintiff's Ex. 1769.

The evidence also showed that NGPL singled out CIG from other NGPL suppliers and ignored its own gas scheduling policies. NGPL scheduled its natural gas requirements by using a priority list of suppliers. Beginning with the last source on the priority list, NGPL would turn each

supplier up to its daily contract quantity or DCQ, progressing up the list to each successive source. CIG, however, was not assigned a DCQ level on the priority list. Each time NGPL went through its priority list, CIG was skipped until all other sources had been turned up to their maximum levels. Tr. at 2202–37.

CIG argued that NGPL's motive for the shut-in was to eliminate lower-priced competition from CIG. The Trailblazer System was operating at only 60 percent of planned levels and at approximately 50 percent of capacity. Tr. at 1569, 1571–78; Plaintiff's Ex. 1333, 483, 399, 500. The evidence shows that NGPL viewed CIG as a major competitor and intended to hinder CIG's ability to compete by controlling its pipeline capacity. The jury could have concluded that NGPL's conduct threatened competition by excluding CIG as a competitor and thus inferred that NGPL specifically intended to monopolize the relevant market. The question is whether the jury could properly make that inference or whether NGPL's conduct was motivated solely by legitimate business concerns.

NGPL defended the shut-in by claiming that CIG's prices were too high, that it needed to reduce its own rates and its take or pay liability to protect itself from potential liability under the *United Gas Pipeline* case, and that it simply had an oversupply of natural gas. The evidence contradicts the first assertion. After the shut-in, NGPL repeatedly purchased gas from other suppliers that was more expensive than CIG's F–1 or H–1 gas. Tr. at 1649–51, 2436–39; Plaintiff's Ex. 1433, 1590. Further, a memorandum from Mr. Pasteris to Mr. Grubb written in August 1984 noted that "CIG's sales to Natural are currently priced at $3.18/Mcf for F–1 and $3.63/Mcf for H–1 gas. Given that this is the price delivered to Natural's mainline the costs are not unreasonable." Plaintiff's Ex. 765. NGPL in fact thought that CIG was an attractive, low-cost supplier. Plaintiff's Ex. 757.

NGPL also contended that it needed to reduce a potential take or pay liability of $215 million in 1983. Tr. at 3515–16; Defendants' Ex. 363. CIG experts challenged that evidence. Tr. at 2396. NGPL studies showed "a significant decrease in projected take-or-pay exposure" of $130 million through fiscal 1983. Plaintiff's Ex. 902–A. In addition, "Canadian sources accounted for $111 million of the total, with Great Lakes projected at $77 million and . . . Pro-Gas at $34 million." *Id.* Companies other than CIG thus contributed substantially to NGPL's take-or-pay problems.

The decision in *United Gas Pipeline* was also used to justify the shut-in. The administrative law judge in the *United Gas Pipeline* case invalidated minimum bill provisions similar to the provision in the Service Agreement. NGPL feared that it might be found to have acted imprudently if it continued to purchase CIG's H–1 gas and decided to reduce purchases of H–1 gas. Tr. at 5292–97. NGPL also claimed that it needed to reduce its own rates to jurisdictional customers. CIG pointed out that, after the shut-in, NGPL repeatedly purchased more expensive gas from other suppliers. Tr. at 1649–51, 2436–39; Plaintiff's Ex. 1433, 1590.

NGPL finally asserted that it shut-in 107 million cubic feet per day of H–1 gas to reduce an oversupply of natural gas. On the day after the shut-in, however, NGPL's takes from other suppliers increased by 93 million cubic feet per day. Tr. at 2271; Plaintiff's Ex. 1986. Assuming that NGPL wanted to decrease its oversupply, to reduce its potential take-or-pay liability, or to avoid paying for costly gas, it could have done so by nominating smaller volumes in 1984. NGPL instead chose to renominate the same volumes but not to take any gas from CIG.

 Evidence of specific intent alone cannot sustain a claim of attempted monopolization without corroborating evidence of conduct. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1028 (9th Cir. 1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Ordinary business practices typical of those used in a competitive market are not anticompetitive. *Telex Corp. v. International Business Mach. Corp.,* 510 F.2d at 925–26. The conclusion that conduct is predatory must be

based not on its effect on a competitor but on its effect on competition. *Pacific Eng'g & Prod. Co. of Nevada v. Kerr-McGee Corp.*, 551 F.2d at 795.

■ The jury rejected NGPL's justification for its conduct and apparently decided that NGPL was not predominantly motivated by legitimate business objectives. This conclusion is based on sharply conflicting evidence and cannot be ignored simply because the Court's view might be different. *Ryder v. City of Topeka*, 814 F.2d 1412, 1418, 1420–21 (10th Cir.1987). The evidence supports a finding that NGPL acted to destroy competition and create a monopoly. NGPL's acts are not ordinary business practices typical of those used in a competitive market. *Telex Corp. v. International Business Mach. Corp.*, 510 F.2d at 925–26. NGPL did more than merely refuse to do business with a rival. Given an opportunity to renominate entitlements and avoid the cost and supply problems caused by the Service Agreement, NGPL instead chose to nominate the same volumes and thus to prevent CIG from offering a low-cost transportation alternative. The antitrust laws are as much violated by the prevention of competition as by its destruction. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). The jury could therefore conclude that NGPL's conduct was anticompetitive and that NGPL specifically intended to monopolize the long-distance transportation market for Wyoming natural gas.

## B. Tortious Interference With Contract

CIG shut-in Champlin Petroleum's Whitney Canyon reserves because NGPL's shut-in created an oversupply of natural gas in CIG's system. Tr. 265–68; 994–1003; 276–77. NGPL negotiated with Champlin to acquire the Whitney Canyon reserves. A letter from NGPL to Champlin summarized their eventual agreement. The letter stated that the sale was subject to a contract between Champlin and CIG. NGPL agreed to increase the purchase price, however, if CIG released its rights to the gas. Plaintiff's Ex. 1476. When CIG attempted to negotiate revisions in the Whitney Canyon contract, Champlin insisted that CIG re-

lease its rights. CIG did so, and NGPL immediately acquired the rights to the Whitney Canyon reserves.

The jury found that NGPL tortiously interfered with CIG's contract with Champlin based upon the *Restatement (Second) of Torts* § 766A (1979). NGPL contends that neither Colorado nor Wyoming recognize § 766A. Assuming that the courts would recognize a cause of action under § 766A, NGPL argues that the Service Agreement conferred an absolute right not to buy CIG's gas and that its conduct was therefore proper. NGPL finally urges that CIG did not suffer cognizable damages under § 774A of the Restatement.

■ Wyoming would recognize a cause of action under § 766A. The tort of intentional interference with contract is accepted in Wyoming. *Basin Elec. Power Co-op. v. Howton*, 603 P.2d 402, 403 (Wyo.1979). The Restatement guided the Wyoming Supreme Court in defining the tort. *See, e.g., Martin v. Wing*, 667 P.2d 1159, 1162 (Wyo. 1983) (recognizing cause of action under *Restatement (Second) of Torts* § 766B); *Wartensleben v. Willey*, 415 P.2d 613, 614 (Wyo.1966) (recognizing cause of action under *Restatement of Torts* § 766). Having accepted sections 766 and 766B, the Wyoming Supreme Court would recognize a cause of action under § 766A.

> The Restatement provides that:
> [o]ne who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

*Restatement (Second) of Torts* § 766A (1979). The elements of the tort include the existence of a valid contractual relationship or business expectancy, knowledge of the relationship on the part of the interferor, intentional and improper interference causing a breach or termination of the relationship, and resultant damage. *Texas West Oil and Gas Corp. v. Fitzgerald*, 726 P.2d 1056, 1062 (Wyo.1986).

CIG and Champlin unquestionably had a valid contractual relationship. The evidence shows that NGPL knew of the existence of the contract. Plaintiff's Ex. 1476. The salient issues are whether NGPL intentionally and improperly interfered with that relationship and whether the interference damaged CIG.

■ NGPL argues that its conduct was justified. The Service Agreement permits NGPL to refuse delivery of CIG's gas and pay for volumes not taken. NGPL construes the take-or-pay option as an absolute right to shut-in CIG's gas. Exercising this contractual right, NGPL urges, cannot constitute an improper interference with contract.

This argument misapprehends CIG's claim. NGPL's tortious act was not the shut-in of CIG's gas. Instead CIG claimed that NGPL used the shut-in to force CIG to release the Whitney Canyon reserves so that NGPL could appropriate the rights to that gas. The argument that CIG consented to this conduct is specious. To be effective, consent must be given to the particular conduct. Action exceeding the scope of the consent is not privileged. *Restatement (Second) of Torts* § 892A & comment c. No showing was made that CIG consented to NGPL's acquisition of the Whitney Canyon reserves. NGPL's rights under the Service Agreement do not permit an interference with CIG's contractual relations with third parties.

The cases cited by NGPL to support its position are inapposite. In *J.C. Penney Co., Inc. v. Davis & Davis, Inc.,* 158 Ga. App. 169, 279 S.E.2d 461 (1981), ABS contracted to repair the defendant's buildings. ABS subcontracted with the plaintiff. Defendant rejected plaintiff's work. Although conceding that its work was defective, plaintiff brought an action for tortious interference with its contract with ABS. The court, noting that the defendant had a right to reject nonconforming work, held that plaintiff failed to show that defendant's actions were wrongful. In *Mac Enter., Inc. v. Del. E. Webb Dev. Co.,* 132 Ariz. 331, 645 P.2d 1245 (Ariz.App.1982), the defendant leased its golf shops to ProShops which in turn sublet a concession to the plaintiff. The lease entitled the defendant to terminate the lease at any time by giving written notice. When the defendant cancelled its lease with ProShops, the plaintiff sued for tortious interference with plaintiff's contract with ProShops. The court held that the defendant's right to cancel the lease entitled it to judgment as a matter of law. Neither case is relevant. Each simply affirms the settled rule that an action for tortious interference will not lie against a party to the contract. *See Kvenild v. Taylor,* 594 P.2d 972, 977 (Wyo. 1979). NGPL was a stranger to the contract between CIG and Champlin. An action is maintainable in these circumstances. *Id.*

The propriety of an actor's interference with another's contractual relationship depends on several factors. These include the nature of the conduct, the defendant's motive, the plaintiff's interests, the interests sought to be advanced by the defendant, the social interest in protecting each party's interests, the proximity or remoteness of the conduct to the interference, and the relations between the parties. *Toltec Watershed Improvement Dist. v. Johnston,* 717 P.2d 808, 814 (Wyo.1986) (quoting *Restatement (Second) of Torts* § 767). Whether the conduct is justified is a question of fact for the jury. *Basin Elec. Power Co-op.—Missouri Basin Power Project v. Howton,* 603 P.2d 402, 403 (Wyo.1979). Defendant bears the burden of proof on this issue. *Id.* at 405. If the defendant had no desire to interfere and merely knew that interference would be an incident of its conduct, the interference may be found to be proper. *Restatement (Second) of Torts* § 766A comment e. NGPL did not merely shut-in CIG's gas knowing that the shut-in might disrupt CIG's relationship with Champlin. NGPL instead acted purposefully to acquire the rights to the Whitney Canyon reserves. Ample evidence supports the jury's finding that NGPL's conduct was improper.

■ Similarly, the jury could rationally conclude that NGPL intentionally interfered with CIG's contract in order to acquire the Whitney Canyon reserves. Malice is not required to establish intent. *Tol-*

*tec Watershed Improvement Dist. v. Johnston,* 717 P.2d at 814. Interference is intentional if the actor desires the result or knows that the interference is substantially certain to result. *Restatement (Second) of Torts* § 766A comment e. The evidence showed that Champlin took the initiative in opening negotiations with NGPL. Tr. at 4026. Nevertheless Champlin demanded that CIG release its rights to the Whitney Canyon reserves and NGPL immediately snatched up those rights after CIG released them. The jury could have concluded that NGPL desired this result or knew that it was substantially certain to occur. The element of intent consequently was met.

■ NGPL finally argues that CIG failed to prove damages resulting from NGPL's conduct. NGPL argues that such damage requires evidence that NGPL's acts made CIG's performance of the Champlin contract more expensive or burdensome.

The tort of intentional interference with contract is aimed at conduct preventing the plaintiff from performing his own contract or making performance more expensive or burdensome. *Restatement (Second) of Torts* § 767 comment a. The cause of action protects plaintiffs from losing the benefit of a third party's performance. *Id.* § 766A comment c. Plaintiffs may consequently recover damages in an amount compensating for all of the detriment proximately caused by the breach of duty. *Texas West Oil and Gas Corp. v. Fitzgerald,* 726 P.2d at 1064. Damages may include the pecuniary loss of the benefits of the contract, consequential losses for which the interference is a legal cause, or other pecuniary losses. *Restatement (Second) of Torts* § 774A & comment b. Section 766A is phrased in the alternative: conduct is tortious if it makes performance more expensive or burdensome or if it prevents the plaintiff from performing its contractual obligations. *Id.* § 766A. A showing that the defendant's acts made performance more expensive or burdensome is not required to recover damages.

CIG presented evidence showing $15,-204,555 in damages resulting from demand charges paid to Canyon Compression and Overthrust Pipeline Company. Tr. at 2623–25; Plaintiff's Ex. 1777. CIG also sought restitution of lost benefits under its contract with Champlin. These damages totaled $24,026,517. Tr. at 2623–25, 2638; Plaintiff's Ex. 1777, 1775. Whether the jury erred in awarding these sums as damages will be considered later. Nevertheless, substantial evidence supports the jury's finding that CIG was damaged as a result of NGPL's intentional and improper interference with CIG's contract with Champlin Petroleum. The motion for judgment notwithstanding the verdict must therefore be denied.

### C. Breach of Contract

The Service Agreement defines CIG's duties as a seller and NGPL's obligations as a buyer of natural gas. The minimum daily take provision of Section 2 states that "Buyer shall not request total daily volumes on any day hereunder less than 90 percent of the General Daily Entitlement." Section 4 contains a minimum annual bill requirement providing that:

> The minimum bill shall be on a fiscal year basis and shall be determined by multiplying the Total Annual Entitlement by a factor of 90 percent, such volume hereinafter referred to as "Minimum Volume"....
>
> In the event Buyer's actual purchases for the fiscal year are less than the Minimum Volume, then any deficiency shall be billed at the unit rate under Rate Schedule F–1....

The jury found that NGPL was in breach of the Service Agreement. NGPL contends that the lack of a filed rate with the Federal Energy Regulatory Commission ("FERC" or "the Commission") and the res judicata effect of the Commission's actions bar recovery of H–1 fixed costs under Section 2. NGPL further argues that Section 4 is the exclusive remedy for a breach of Section 2. NGPL finally argues that CIG's course of performance vitiates any breach of contract claim.

### 1. FERC Orders and Regulations

On October 18, 1983, a FERC Administrative Law Judge found the minimum bill

provisions of Sections 2 and 4 to be unjust and unreasonable. *Colorado Interstate Gas Co.*, No. RP82-54-000, 25 FERC ¶ 63,012 (1983). The Commission affirmed the ALJ on May 25, 1984, and ordered CIG to eliminate variable costs from its minimum bill to NGPL. *Id.* ¶ 61,315 at 61,583, 61,584 (1984). The Commission said, however, that "our conclusion that CIG's minimum bill to Natural is not just and reasonable does not mean that CIG may not employ a minimum bill in serving that customer." *Id.* at 61,583.

CIG filed amended tariffs in an attempt to comply with the May 25, 1984 order. CIG dropped variable costs from the minimum bill but also sought to amend the Service Agreement to permit collection of minimum bill deficiency payments using the H-1 rate for H-1 deficiencies and the F-1 rate for F-1 deficiencies. The compliance filings were rejected, and CIG appealed to the Commission. *Colorado Interstate Gas Co.*, No. RP82-54-014, 29 FERC ¶ 61,124 at 61,243 (1984). CIG argued before the Commission that the May 25, 1984 order permitted recovery of fixed costs allocable to NGPL under the H-1 and F-1 rates. On October 31, 1984, FERC rejected the appeal, reasoning that:

> ... the May 25, 1984 order did not definitively rule on the proper level of fixed cost recovery in CIG's minimum bill. Instead, the Commission found that the record was insufficient to determine whether the existing level of fixed cost recovery ... in the minimum bill is just and reasonable. We therefore did not order any changes in the existing level of fixed cost recovery.
>
> ... [Order No. 380-C] removed variable costs from minimum commodity bills and did not address what level of fixed costs should be included. *In fact, the Commission expressly declined to rule on whether any fixed costs should be recovered through a minimum bill.*

*Id.* at 61,244 (emphasis added). CIG appealed this decision. The United States Tenth Circuit Court of Appeals affirmed, holding that the Commission's decision was rational and supported by substantial evidence. *Colorado Interstate Gas Co. v. FERC*, 791 F.2d 803, 811 (10th Cir.1986).

A subsequent compliance filing was accepted by FERC. 30 FERC ¶ 61,073 (1985).

 NGPL concludes that FERC's actions preclude recovery of damages predicated upon H-1 fixed costs. It argues that FERC allowed CIG to charge only the F-1 fixed cost of gas not taken, that CIG thus has no H-1 tariff on file with FERC, and that damages based on H-1 fixed costs are consequently barred by the filed rate doctrine and principles of res judicata. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 584, 101 S.Ct. 2925, 2933, 69 L.Ed.2d 856 (1981) (courts may not award damages based on rates other than those approved by FERC).

The Commission's orders of May 25 and October 31, 1984 do not bar recovery of damages which are calculated from H-1 fixed costs. The emphasized portion of the October 31 order states that FERC had not decided whether fixed costs were recoverable. CIG's compliance filings were rejected not because FERC determined that H-1 fixed costs were not recoverable but rather because CIG's compliance filings exceeded the scope of the May 25 order, which did not specifically permit modification of the minimum bill to recover fixed costs. *See Colorado Interstate Gas Co. v. FERC*, 791 F.2d at 810.

 Other FERC orders reinforce this view. FERC Order No. 380 precludes recovery of the variable costs of gas not taken. *FERC Statutes and Regulations* ¶ 30,571 (1984) (codified at 18 C.F.R. § 154.-111 (1986)). Order No. 380-C applied Order No. 380 to minimum bill provisions. *Id.* ¶ 30,607 at 31,197. The Commission noted however, that "[b]y making the rule applicable to ... minimum take provisions, *no additional refiling requirements are imposed on the pipeline.*" *Id.* at 31,196 (emphasis added). Rate schedules must be refiled only if they fail to state purchase gas costs separately. 18 C.F.R. § 154.-111(a)(3)(ii). CIG's commodity rate subsumed H-1 and F-1 fixed costs. This tariff remained effective to the extent it excluded recovery of variable costs. Order No. 380-D, 29 FERC ¶ 61,332 at 61,692 (1984). CIG therefore had a filed H-1 rate.

The Commission's order of June 19, 1985 demonstrates that FERC did not abrogate the minimum daily take requirement of Section 2. In February 1987, NGPL filed a motion before FERC to eliminate the minimum take provision. The Commission denied the motion, concluding that the relief sought by NGPL was "not consistent with our prior orders in this case or with our regulations." *Colorado Interstate Gas Co.*, No. RP82–54–017, 31 FERC ¶ 61,325 at 61,743 (1985). The Commission, quoting Order No. 380–D, pointed out that:

> [m]inimum take provisions remain currently effective except to the extent that they operate to recover variable costs for gas not taken by the buyer. The Commission in Order No. 380–C only eliminated the recovery of *variable* costs under a pipeline's minimum take provision. In other words, minimum take provisions are treated in the same manner as minimum commodity bills. The *fixed* cost component included in a selling pipeline's commodity rate may still be recovered by that seller for the number of units of gas specified in the minimum take provision even where the buyer does not take that specified minimum amount.

*Id.* (emphasis in original). The Commission's determination that "the prior orders in Docket No. RP82–54 [do] not require CIG to eliminate the minimum take provision from its service agreement," *id.*, defeats NGPL's argument. FERC exercised its power to modify Section 2 but expressly affirmed CIG's right to recover fixed costs under the minimum take provision. The Commission's actions do not require the Court to set aside the jury's verdict.

### 2. Exclusive Remedy and Course of Performance

██ NGPL urges that Section 4 creates an exclusive remedy for breach of the Service Agreement. As NGPL reads it, the Service Agreement requires that NGPL pay the minimum bill as provided in Section 4 if NGPL chooses not to purchase or receive 90 percent of the General Daily Entitlement. Section 4 must therefore be "the only remedy contained in the Service Agreement." NGPL Brief at 46. This argument ignores the basic principle that contractual remedies are optional unless "expressly agreed to be exclusive." U.C.C. § 2–719(1)(b). This subsection. creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. Parties who intend a contractual provision to constitute a sole remedy must clearly express that intention. *Id.* comment 2. NGPL contends, however, that the record rebuts the U.C.C.'s presumption of nonexclusive remedies.

Every contract should be construed as a whole, giving effect to each portion of the instrument. *Colorado Milling & Elevator Co. v. Chicago, Rock Island & Pacific R.R. Co.*, 382 F.2d 834, 836 (10th Cir.1967). NGPL argues that construing Section 2 as an independent obligation makes Section 4 irrelevant, because a failure to take the General Daily Entitlement under Section 2 would produce a larger minimum annual bill than Section 4, which averages daily takes over a year.

This reading has two flaws. First, Section 4 does not provide that daily takes will be averaged in arriving at the annual minimum bill. It instead states that the minimum annual bill is determined by multiplying 90 percent times the "Total Annual Entitlement" (defined in Section 1 as 78,-150,000 Mcf). This calculation produces the "Minimum Volume." The Minimum Volume is. determined "on the basis of the average of several General Daily Entitlements" only "[i]f the specified General Daily Entitlement is revised during the fiscal year." The language of the Service Agreement does not support NGPL's argument. Second, construing Section 4 as an exclusive remedy reads Section 2 out of the Service Agreement. Sections 2 and 4 can be harmonized without eviscerating Section 2. The Service Agreement was executed in 1982, a time when natural gas was in relatively short supply and when costs were generally high. Section 2 assures NGPL of a minimum daily volume of 170,000 Mcf during the winter (the "Swing Period"). NGPL is thus ensured a supply of natural gas during periods of high demand and short supply. In return, NGPL agreed to take 90 percent of the General Daily Entitlement, thereby assuring CIG's recovery of the high costs of purchasing and ship-

ping the gas. Section 4 then sets forth the billing mechanism for the transaction. The two provisions can thus be given independent yet consistent content.

■ NGPL next argues that the jury ignored the parties' course of performance. The core of the argument is that CIG only tendered annual bills under Section 4. Whenever reasonable, a contract's express provisions and any course of performance should be given a consistent construction. U.C.C. § 2–208(2). The express terms of the contract govern in a conflict with the parties' course of performance. *Id.; KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769, 770 (Colo.1985) (en banc). Nothing in Section 4 requires CIG to submit a claim under Section 4 for a breach of Section 2. CIG's course of performance is thus consistent with the express terms of the Service Agreement.

The terms of the U.C.C., a consistent construction of Sections 2 and 4, and the parties' course of performance support a conclusion that Section 4 is not an exclusive remedy for breach of the Service Agreement. CIG was accordingly entitled to resort to the remedies specified in the U.C.C. FERC exercised its statutory powers to modify Section 2 but did not preclude recovery of H–1 costs as damages in this action. Presented with this very issue, the Commission in its order of June 19, 1985, declined to challenge this suit as a collateral attack on its prior orders. *See Colorado Interstate Gas Co.*, No. RP82–54–017, 31 FERC ¶ 61,325 at n. 2. NGPL's motion for judgment notwithstanding the verdict on CIG's breach of contract claim must therefore be denied.

### D. Breach of the Duty of Good Faith and Fair Dealing

The Uniform Commercial Code and the common law each impose on the parties to a contract the duty to perform in good faith. U.C.C. § 1–203; *Restatement (Second) of Contracts* § 205 (1981). Good faith normally requires "honesty in fact in the conduct or transaction concerned." U.C.C. § 1–201(19). In the case of merchants, good faith demands both "honesty in fact and the observance of reasonable commercial standards of fair dealing in the

trade." *Id.* § 2–103(1)(b). The implied covenant enjoins each party to "do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish its purpose." *Conoco, Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895, 908 (8th Cir.1985).

■ The jury found that NGPL violated its duty of good faith and fair dealing under the Service Agreement. NGPL advances four reasons to set aside the verdict. It first contends that the duty of good faith and fair dealing does not afford an independent cause of action. Even if a cause of action does exist, the exercise of valid contractual rights cannot violate the duty. NGPL further argues that no evidence supports the jury's verdict and, finally, that CIG failed to prove the reasonable commercial standards of fair dealing within the natural gas industry.

A majority of jurisdictions recognize the duty to perform a contract in good faith. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369 (1980). As one court has observed, "it is unnecessary to speculate upon ... acceptance or rejection [by the applicable state supreme court] of the modern doctrine of 'obligation to perform in good faith.' The doctrine ... is simply a rechristening of fundamental principles of contract law." *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C.Cir.1984). The Colorado and Wyoming legislatures adopted the U.C.C.'s definition of good faith. Colo.Rev.Stat. § 4–1–203 (1973); Wyo.Stat. § 34–21–122 (1977). Although the parties have not cited any relevant decision by the Colorado Supreme Court, the lower courts in that State seem inclined to recognize a cause of action for breach of the duty. *Layne v. Fort Carson Nat'l Bank*, 655 P.2d 856, 857 (Colo.App.1982) (affirming summary judgment in favor of a lender on claim that lender violated the good faith requirements of the U.C.C.); *Ruff v. Yuma County Transp. Co.*, 690 P.2d 1296, 1298 (Colo.App.1984) (recognizing applicability of *Restatement (Second) of Contracts* § 205). Wyoming's Supreme

Court has implicitly recognized a cause of action for breach of the duty. *Wendling v. Cundall*, 568 P.2d 888, 890 (Wyo.1977) (applying U.C.C. good faith standard to contract for the sale of real estate). *See also Garner v. Hickman*, 709 P.2d 407, 411 (Wyo.1985) (discussing lender's duty of good faith and fair dealing in action for defective construction of a modular home). An independent cause of action exists for breach of the duty of good faith and fair dealing.

NGPL argues that, even if a cause of action is available, exercise of express contractual rights cannot constitute a breach of the duty. Section 1 of the Service Agreement permits NGPL to "pay for or to purchase and receive ... [specified] quantities of natural gas." The Service Agreement does not obligate NGPL to accept deliveries of H–1 gas, NGPL argues, and thus it cannot breach the duty of good faith by refusing to do so.

In support of its argument, NGPL cites *VIR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F.Supp. 773 (S.D.N.Y.1969),[3] where plaintiff was to receive commission payments for a specified term, but the contract also provided that Goodyear could terminate the payments at any time with or without cause. *Id.* at 775. Plaintiff alleged that Goodyear failed to operate the business in good faith by willfully causing the business to deteriorate, thus depriving plaintiff of part of its consideration. The District Court granted Goodyear's motion for summary judgment, reasoning that a party cannot breach the duty of good faith and fair dealing by conduct expressly permitted by the contract. *Id.* at 778.

This view was rejected in *Tymshare*. The court acknowledged that when a contract is drawn to leave decisions absolutely to the uncontrolled discretion of one of the parties the issue of good faith is irrelevant. *Tymshare, Inc. v. Covell*, 727 F.2d at 1153. The Court noted, however, that "to say that every expressly conferred contractual

power is of this nature is virtually to read the doctrine of good faith ... out of existence." *Id.* at 1153–54.

■ In contrast to the facts in *VIR*, the Service Agreement limits NGPL's discretion. Section 2 states that "[v]ariations in daily takes may be made at Buyer's election at H–1 delivery points *to meet its varying load conditions.*" This requirement limits NGPL's right to refuse deliveries of H–1 gas. NGPL may not refuse deliveries for any reason; it can do so only "to meet its varying load conditions." If NGPL's discretion was unbounded, its promise to take or pay would be illusory.

■ Any rights NGPL possessed had to be exercised in good faith to effectuate the parties' intent. *Boone v. Kerr-McGee Oil Indus., Inc.*, 217 F.2d 63, 65 (10th Cir.1954). The question is whether substantial evidence supports a finding that NGPL failed to exercise its contractual rights in good faith.

Wyoming's Supreme Court, discussing the U.C.C. standard of good faith, said that good faith consists of "an honest intention to abstain from taking any unconscientious advantage of another, even through the forms of technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." *Wendling v. Cundall*, 568 P.2d 888, 890 (Wyo.1977) (quoting *Cone v. Ivinson*, 4 Wyo. 203, 33 P. 31 (1893)). The test requires honesty of intent rather than diligence or nonnegligence. *Id.*

From the evidence presented at trial, the jury could have reasonably concluded that NGPL failed this test. For example, NGPL renominated its full capacity under the Service Agreement, yet refused to accept delivery of those volumes when the renomination became effective. NGPL also singled out CIG for minimal or zero takes and failed to follow its own gas scheduling policies. CIG adduced evidence

---

**3.** NGPL also cites the decision in *Bill's Coal Co., Inc. v. Board of Pub. Util.*, 682 F.2d 883 (10th Cir.1982). That case is inapposite. The court held that, absent some effect on either party's performance, urging an interpretation of a contract which does not reflect the parties' intent is

not a breach or repudiation of a contract. *Id.* at 885. NGPL did not merely espouse a particular interpretation of the Service Agreement. Its actions clearly affected both parties' performance.

from which the jury could have concluded that NGPL lied to CIG about the shut-in. *See supra* text at 1467–68; *see also* Tr. at 2274. This alone would show that NGPL failed to act with the "honesty of intent" required by § 1–201.

■ NGPL argues, however, that CIG failed to prove the reasonable commercial standards of fair dealing within the natural gas industry. CIG's expert, Mr. Morgan, pointed out that reasonable standards in the industry originate in the need for long-term stability due to the high cost of pipeline construction. Mr. Morgan testified that reasonable commercial standards are incapable of precise definition and instead must be determined from the facts of each case. Tr. at 2197–98. The courts support this approach. *See Tymshare, Inc. v. Covell*, 727 F.2d at 1152 (quoting Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va.L.Rev. 195, 201 (1968) (good faith is a concept without general meaning)). Instead of providing a formula, Mr. Morgan gave specific examples of conduct which would not comport with reasonable standards within the industry. This evidence sufficiently defined industry standards of fair dealing.

■ An opposite conclusion does not assist NGPL. The U.C.C. requires observance of reasonable commercial standards of fair dealing *and* honesty in fact in the transaction. U.C.C. § 2–103(1)(b). Both requirements must be satisfied to meet the duty of good faith. Here, evidence showed that NGPL did not act honestly in fact in its transactions with CIG. The jury could reasonably find a breach of the duty of good faith and fair dealing on NGPL's part. *See Neumiller Farms, Inc. v. Cornett*, 368 So.2d 272 (Ala.1979) (a party rejecting another's performance for feigned reasons does not exercise discretion within the parties' contemplation). The verdict thus cannot be set aside.

### E. Conclusion

Despite its forceful arguments, NGPL failed to meet the demanding standards required to upset a jury verdict. The jury found in favor of CIG after considering sharply conflicting testimony from which reasonable minds could draw different conclusions. In these circumstances, the Court must defer to the jury. A highly distinguished practitioner articulated the reason for the courts' deference to jury verdicts:

> It is possible to take the record of any trial and by minute dissection and post-facto reasoning demonstrate that witnesses for either side made egregious errors or lied. Then by ascribing critical weight to the exposed facts, the conclusion is reached that the verdict was fraudulently obtained.
>
> . . . .
>
> The fallacy in this approach is that it assumes that all the evidence for the winning side must be believed by the jury, or it would not decide as it did. It ignores the jury's right to be selective of a witness' story and also the reality of conflict of testimony, which the jury must resolve by applying its common sense and keen observation of the witnesses. . . . The jury may choose to believe one witness, and often does, against five witnesses who testified to the contrary.
>
> . . . .
>
> Nor does it follow that because there is alloy in some pieces of gold on one side of the scales that the jury's recognition of its meretricious nature requires it to ignore the decisive tipping of the scales from other weights on the same scale. The opposite scale might be lighter, too. . . .
>
> The point is that it is the composite effect which is determinative, not a dissection of each fact as if it were the whole.

L. Nizer, *The Implosion Conspiracy* 6–7 (1973).

The standards for judgment notwithstanding the verdict require the Court to uphold the jury's action if it finds rational support in the evidence. *See supra* text at 1457–58. Substantial conflicting evidence supports the jury's verdict in favor of CIG. NGPL's motion for judgment notwithstanding the verdict must therefore be denied.

## II. DAMAGES

NGPL attacks CIG's proof of damages. At a minimum, NGPL contends, a remittitur must be granted as to $117,000,000 awarded to CIG as future damages, $53,000,000 in Northwest Pipeline Company minimum bill payments, and $24,000,000 in restitutionary damages for tortious interference with contract. NGPL urges in the alternative that judgment notwithstanding the verdict or new trial is required because:

(1) Future fixed costs cannot be recovered as damages for breach of the Service Agreement;

(2) Minimum bill payments CIG owes to Northwest Pipeline Company are nonrecoverable consequential damages;

(3) CIG's proof of damages was impermissibly speculative;

(4) The jury ignored offsetting benefits accruing to CIG as a result of NGPL's actions;

(5) The jury awarded improper damages for tortious interference with contract; and

(6) CIG failed to prove antitrust damages.

Each contention will be examined in turn.

### A. Breach of Contract Damages

The jury found that CIG suffered $159,797,156 in damages as a result of NGPL's breach of contract. This is the sum of CIG's lost profits ($106,580,792) plus minimum bill payments CIG owes to Northwest Pipeline Company ($53,216,364). The Court deleted the award from the judgment because recovery of contract damages would have duplicated recovery under the antitrust claim. NGPL nevertheless challenges the award on two grounds. Its first argument is that future fixed costs due under the Service Agreement cannot be recovered as damages for breach of contract. NGPL also argues that CIG's minimum bill payments are nonrecoverable consequential damages. Both elements of damage, however, are recoverable under the provisions of the Uniform Commercial Code.

NGPL argues that future damages cannot be recovered when a contract is still being performed. The Service Agreement continues in force until FERC permits the parties to abandon it. NGPL therefore concludes that, absent a total breach of contract, CIG may not recover future damages based on fixed cost payments not yet due under the Service Agreement.

■ When a buyer wrongfully rejects goods or repudiates with respect to a part or the whole, the seller may recover damages for nonacceptance. U.C.C. § 2–703. The measure of damages for the buyer's nonacceptance or repudiation is the difference between the market price at the time and place of tender and the unpaid contract price, plus any incidental damages, but less expenses saved in consequence of the buyer's breach. *Id.* § 2–708(1). Lost profits are available as an alternative measure of damages if the market-contract price differential in 2–708(1) is inadequate to put the seller in as good a position as if the buyer had fully performed. *Id.* § 2–708(1).

A market must exist in order to recover market based damages under § 2–708(1). Absent a market for the goods, § 2–708(1) is an inadequate measure of damages. *Autonumerics, Inc. v. Bayer Indus., Inc.,* 144 Ariz. 181, 696 P.2d 1330, 1340 (Ariz.App. 1984). *Accord Copymate Marketing Ltd. v. Modern Merchandising, Inc.,* 34 Wash. App. 300, 660 P.2d 332 (1983); *Neumiller Farms, Inc. v. Cornett,* 368 So.2d 272 (Ala. 1979); *Timber Access Indus. Co. v. U.S. Plywood-Champion Papers, Inc.,* 263 Or. 509, 503 P.2d 482 (1972); *Anchorage Centennial Dev. Co. v. Van Wormer & Rodrigues, Inc.,* 443 P.2d 596 (Alaska 1968). In this case, the shut-in effectively prevented CIG from transporting natural gas. No market existed for CIG's gas so long as NGPL refused to take. The market-contract price measure of damages in § 2–708(1) does not adequately measure CIG's damages. CIG can be made whole only by receiving its lost profits under the Service Agreement and consequently is entitled to recover future fixed costs pursuant to § 2–708(2).

■ Similarly, CIG's minimum bill payments to Northwest Pipeline Company are

recoverable as reasonable overhead under § 2–708(2) or as incidental damages under § 2–710. In order to supply NGPL with the volumes required under the Service Agreement, CIG purchased natural gas from Northwest Pipeline Company. CIG has incurred substantial minimum bill payments to Northwest Pipeline Company for the gas CIG is unable to take because of the shut-in. The minimum bill payments were awarded to CIG as damages for breach of the Service Agreement. NGPL urges that these payments are nonrecoverable consequential damages.

Consequential damages are generally nonrecoverable. U.C.C. § 1–106(1). Sellers may, however, recover incidental damages. A seller's incidental damages include "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." *Id.* § 2–710. The goal is to put the seller in the same position as if the buyer had performed. *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 483 (2d Cir.1983). CIG's minimum bill payments can be viewed as commercially reasonable charges incurred in stopping delivery as a result of NGPL's breach. These expenses are recoverable under § 2–710, and the jury properly awarded them as damages to CIG.

**B. CIG's Proof of Damages and Offsetting Benefits Received by CIG**

■■■■ NGPL contends that the testimony of CIG's damage expert, Dr. Rhodes, was based on erroneous assumptions. Especially in antitrust litigation, the burden of proving the amount of damages is less than that required to prove the fact of damage. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1526 (10th Cir. 1984), *aff'd,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). If the calculations upon which damages, including lost profits, are reasonably estimated and if the record supports the expert's assumptions, the calculations are a valid measurement of damage. *Id.* (quoting *King & King Enter. v.*

*Champlin Petroleum Co.,* 657 F.2d 1147 (10th Cir.1981)).

■■■■ NGPL's objections go to the weight and credibility of Dr. Rhodes' testimony. Dr. Rhodes explained his assumptions and their inadequacies to the jury. Counsel for NGPL cross-examined Dr. Rhodes at length in an attempt to discredit his testimony. Dr. Rhodes grounded his calculations on CIG's accounting records and tariff filings. Tr. at 2845–46; 2848–51; 2853–54. The calculations were reasonably estimated and were supported by the record. The weight to be accorded Dr. Rhodes' testimony was consequently a question for the jury. *State Office Systems, Inc. v. Olivetti Corp. of America,* 762 F.2d 843, 846 (10th Cir.1985); *Brown v. McGraw-Edison Co.,* 736 F.2d 609, 616 (10th Cir.1984). The jury believed Dr. Rhodes' testimony and rejected NGPL's contention that CIG benefitted from the release of Champlin's Whitney Canyon gas. CIG presented evidence that a reasonable possibility existed of renegotiating the price of the Whitney Canyon gas. The jury's verdict was not against the weight of the evidence.

**C. Tortious Interference with Contract**

NGPL challenges the jury's damage award for tortious interference with contract. That award included damages incurred as a result of demand charges payable to Overthrust and Canyon Compression to ship the Whitney Canyon gas, plus $24,026,517 in restitution for profits received by Trailblazer Pipeline Company for transporting Whitney Canyon gas.

■■■■ NGPL would limit damages for tortious interference with contract to extra expenses incurred by CIG in performing its contract with Champlin. The measure of damages for tortious interference with contract, however, is "the amount which will compensate for all the detriment proximately caused by the breach of duty." *Martin v. Wing,* 667 P.2d 1159, 1163 (Wyo. 1983). Substantial evidence supports the conclusion that the demand charges payable to Overthrust and Canyon Compres-

sion were incurred as a proximate result of NGPL's wrongful interference.

■ NGPL next claims that restitution is not an appropriate remedy for tortious interference with contract. Damages for tortious interference are based in tort, not in contract. *Restatement (Second) of Torts* § 774A comment d. Restitution has long been an accepted remedy for tortious interference with contract. *See, e.g., Zippertubing Co. v. Teleflex, Inc.,* 757 F.2d 1401 (3rd Cir.1985); *National Merchandising Corp. v. Leyden,* 370 Mass. 425, 348 N.E.2d 771 (1976); *Automatic Laundry Serv. v. Demas,* 216 Md. 544, 141 A.2d 497 (1958); *Schechter v. Friedman,* 141 N.J.Eq. 318, 57 A.2d 251 (Ct.Err. & App. 1948); *Caskie v. Philadelphia Rapid Transit Co.,* 321 Pa. 157, 184 A. 17 (1936); *Second Nat'l Bank v. M. Samuel & Sons, Inc.,* 12 F.2d 963 (2d Cir.), *cert. denied,* 273 U.S. 720, 47 S.Ct. 110, 71 L.Ed. 857 (1926); *Federal Sugar Refining Co. v. United States Sugar Equalization Bd.,* 268 F. 575 (S.D.N.Y.1920). Restitution is available as a remedy, and CIG was entitled to restitution of profits for NGPL's tortious interference with contract.

Care must be taken, however, "to avoid gouging even the consciously wrong defendant." D. Dobbs, *Law of Remedies* § 6.4 at 465 (1973). Only one-third of the Trailblazer Pipeline Company is owned by NGPL. Forcing it to disgorge funds it did not receive would unfairly penalize NGPL. A remittitur of two-thirds of $24,026,517, the amount awarded as restitution for profits received by Trailblazer Pipeline, is appropriate. The sum owed by NGPL totals $8,008,839. The Court will therefore grant a remittitur in the amount of $16,017,678.

### D. Antitrust Damages

■ Recovery of treble damages requires proof of antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* The injury must reflect the anticompetitive effect of the violation or of the anticompetitive acts made possible by the violation. It should be the type of loss that the claimed violation would be likely to cause. *Id.* The antitrust violation in this case is NGPL's attempt to monopolize the market for the long distance transportation of Wyoming natural gas. To satisfy the *Brunswick* standard CIG had to show that its injury and resulting damages were causally related to a) the long distance transportation of b) Wyoming natural gas.

CIG claimed three elements of antitrust damage: demand charge losses incurred by CIG as a result of the shut-in; minimum bill payments CIG owes Northwest Pipeline as a result of the shut-in; and lost profits. Demand charges are contractual payments required to reserve transportation capacity through a pipeline. Tr. at 2623. The Northwest Pipeline bill is a sum CIG must pay to Northwest Pipeline for gas it is unable to ship due to the shut-in. Tr. at 2634–35. As explained earlier, the Northwest Pipeline payments and CIG's demand charge losses are causally related to the antitrust violation.

■ Lost profits are the remaining element of damage which must be considered. CIG's damage expert, Dr. Rhodes, testified that CIG's lost net profits (discounted to present value) totaled $106,580,792. He reached this figure by adding CIG's past lost net profits to CIG's future net lost profits. Tr. at 2564–65; Plaintiff's Ex. 1768. Dr. Rhodes calculated past lost net profits by subtracting F–1 from H–1 lost profits. Tr. at 2561. He subtracted F–1 lost profits from past damages because NGPL had paid those costs in its minimum bill payments. Tr. at 2771. He included future F–1 lost profits in calculating future net lost profits, however, because NGPL had not paid those costs. Dr. Rhodes therefore calculated future net lost profits by adding future H–1 lost net profits to future F–1 lost net profits. Tr. at 2610. CIG's total future net lost profits totaled $60,388,000.

Certain volumes of gas delivered at the H–1 delivery point are transported from Wyoming. Tr. at 229–30. In contrast, F–1 gas is produced from wells in Oklahoma and flows through gathering lines to the

F-1 delivery point in Forgan, Oklahoma. None of the gas sold under F-1 is transported through the main transmission system. Tr. at 229.

Given CIG's antitrust theory, damages based upon F-1 costs are not recoverable as antitrust damages. F-1 gas is not produced in Wyoming and is not shipped in the long distance transportation market for Wyoming gas. *Ipso facto,* damages based upon lost profits for F-1 gas are unrelated to NGPL's attempt to monopolize the long distance transportation of Wyoming natural gas. Consequently, future net lost profits based upon F-1 fixed costs are not the type of injury that the antitrust violation was likely to produce. Losses of future F-1 profits do not flow from that which made NGPL's actions unlawful. *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. The jury erred in awarding these losses as antitrust damages, and NGPL is entitled to a remittitur of damages based upon future F-1 lost profits.

 The total amount of future net lost profits was $60,388,000. Dr. Rhodes' testimony and his damage summary (Defendants' Ex. 3036) does not disclose what portion of that amount consists of future H-1 lost profits and what protion consists of future F-1 lost profits. The record's silence prevents the Court from deleting only F-1 lost profits. The Court will therefore grant a remittitur of all future net lost profits after trebling.

 As explained above, CIG is entitled to recover future lost profits as contract damages. *See supra* text at 1477 – 78. The jury awarded CIG $159,797,156 in damages for breach of contract. At CIG's suggestion and with CIG's consent, the Court reduced the judgment by this amount in order to prevent double recovery. Included in the total award for contract damages was $106,580,792 for lost profits. This sum includes the $60,388,000 in future net lost profits. The jury therefore awarded CIG its future net lost profits as contract damages. The Court will not impose additional liability on NGPL by allowing CIG to recover future net lost profits as damages for breach of contract, because the jury previously awarded these sums as contract damages. Accordingly, the Court will grant a remittitur of $181,164,000 ($60,388,-000 trebled) and reinstate the jury's award of contract damages in the amount of $60,-388,000.

## III. NEW TRIAL

NGPL contends that it was denied due process in the trial of this case. A new trial may be granted under Fed.R.Civ.P. 59 to ensure that justice is done. *Holmes v. Wack,* 464 F.2d 86, 88–89 (10th Cir.1972). The burden of showing harmful error, however, rests with the moving party. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2803 at 32 (1973). NGPL's contentions are without merit, and its motion for a new trial will be denied.

 The first point of controversy is a poem written by a juror during the trial. The juror gave the poem to the Court's law clerk, who reported the contact to the Court. Contrary to counsel's assertion, neither the Court nor its staff circulated copies to the jury. The Court instead gave typed copies to counsel to inform them of the development. Counsel failed to request any remedial action by the Court but instead waited to object until long after a verdict was returned. NGPL consequently waived its claim of error. *General Motors Corp. v. Walden,* 406 F.2d 606, 610 (10th Cir.1969). Moreover, NGPL exaggerates the significance of the poem. Interpreting the poem as a criticism of NGPL's witnesses is pure speculation. The poem reflects fatigue caused by a lengthy trial requiring the jurors' intense concentration. It does not suggest that the jury was biased or improperly formed an opinion. Indeed, the poem is not cognizable evidence of juror misconduct. Fed.R.Evid. 606(b); *United States v. Jelsma,* 630 F.2d 778, 779 (10th Cir.1980). Substantial evidence supported the jury's decision. This shows that the jury was not inflamed or biased against NGPL.

 NGPL argues that the Court incorrectly instructed the jury on the obligations imposed by the Service Agreement. NGPL particularly objects to "the failure to instruct the jury that Natural had no obligation to take CIG's gas." NGPL Brief at

45 n. 26. The jury was expressly instructed, however, that it could not find a breach of the Service Agreement unless NGPL failed to request the minimum volumes specified in the Service Agreement *and* failed to pay the proper fixed costs of volumes not taken under Section 2. Jury Instruction No. 14. This instruction is substantially the same as NGPL's Revised Proposed Instruction No. 30 and makes clear that NGPL was not in breach of contract merely by refusing to take CIG's gas.[4]

■ At CIG's request, the Court instructed the jury that CIG claimed that NGPL sought to create a monopoly for the Trailblazer System. The pretrial order stated that NGPL attempted to create a monopoly for the Trailblazer Pipeline. NGPL asserts that permitting CIG to change its antitrust theory at the jury instruction conference defeated NGPL's defense.

The instructions were consistent with the evidence adduced at trial. CIG moved to amend the pleadings, pursuant to Fed.R. Civ.P. 15(b), to conform to the evidence. The Court granted the motion without objection from NGPL, and the pretrial order was consequently amended. By failing to object to CIG's evidence and by producing its own evidence on the issue, NGPL impliedly consented to trial of the amended issues. *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456–57 (10th Cir.1982).

■ NGPL contends that the Court improperly excluded testimony not fully designated prior to trial. Ample notice was given to NGPL of the necessity to provide specific witness designations. NGPL did not object to the requirement that both parties submit simultaneous witness designations one month prior to trial. NGPL's unsupported assertion that the excluded testimony resulted in prejudice does not meet the required showing. *Andrews v. Olin Mathieson Chem. Corp.*, 334 F.2d 422, 428 (8th Cir.1964).

■ Evidence that NGPL relied on the advice of counsel was rejected by the Court. NGPL resisted discovery on this issue. A party refusing to permit discovery on the advice of counsel may not assert the defense at trial. *International Tel. & Tel. Corp. v. United Tel. Co. of Florida*, 60 F.R.D. 177, 186 (M.D.Fla.1973). Bias against NGPL did not motivate the Court. NGPL offered its brief in support of the proffered evidence moments before the matter was argued. The Court provisionally excluded the evidence and, after studying NGPL's memorandum, reaffirmed its ruling. NGPL's assertion that CIG was permitted to present evidence of its reliance on the advice of counsel distorts the facts. NGPL raised this issue on cross-examination of a CIG witness. Tr. at 1211–13.

■ The Court excluded NGPL's evidence that CIG threatened to intervene in FERC proceedings. The *Noerr-Pennington* Doctrine bars such evidence. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Nothing suggests an abuse or corruption of the judicial process justifying admission of the evidence under the "sham exception" to the rule. *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1176–77 & n. 7 (10th Cir.1982).

■ NGPL contends that permitting the claim of breach of the duty of good faith to go to the jury allowed CIG to mislead and inflame the jury during closing arguments. A cause of action does exist for breach of the duty. *See supra* text at 1474–76. The claim was properly submitted to the jury. NGPL failed to object to CIG's closing argument at trial. Its present challenge is untimely. *Computer Systems Eng'g., Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir.1984).

Carefully comparing the record with NGPL's assertions reveals no prejudice re-

---

**4.** NGPL also claims that Jury Instruction No. 16 confused the jury by incorrectly stating the effect of FERC's orders. This contention is addressed earlier in the opinion. *See supra* text at 1471–73 NGPL also asserts that the Court ex-

cluded relevant evidence of FERC proceedings. The Court, however, permitted witnesses to testify concerning any FERC order that formed the basis of their opinion or influenced their actions.

quiring a new trial. The motion for a new trial must be denied. It is therefore

ORDERED that defendants' motions for judgment notwithstanding the verdict or for new trial be, and the same hereby are, denied. It is further

ORDERED that unless plaintiff Colorado Interstate Gas Company or its attorney remits the sum of $197,181,678 on the judgment entered herein with ten (10) days from the date of this order, the verdict of the jury be, and the same hereby is, set aside and a new trial will be ordered.

If plaintiff or its attorney remits the sum of $197,181,678 the judgment entered herein within ten (10) days from the date of this order, the motion for a new trial is denied, and the jury's award for breach of contract, as previously reduced by the Court, is reinstated nunc pro tunc in the amount of $60,388,000. In this event the clerk of the court is directed to correct the judgment heretofore entered in this case to conform to the amount of the verdict as herein reduced and reinstated.